# IN THE SUPREME COURT OF IOWA

No. 18–0319

Filed March 22, 2019

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**ERIC KENYATTA PARRISH,**

Respondent.

On review of the report of the Iowa Supreme Court Grievance Commission.

On review of a grievance commission report recommending revocation of the respondent's license to practice law in this state. **LICENSE SUSPENDED.**

Tara van Brederode and Elizabeth E. Quinlan, for complainant.

Eric K. Parrish, Ankeny, pro se.

**APPEL, Justice.**

In this matter, the Iowa Supreme Court Attorney Disciplinary Board brought a series of charges against attorney Eric Parrish related to his handling of a payment made by a client that the Board alleged was for the specific purpose of paying the cost of preparing a transcript on appeal. The Iowa Supreme Court Grievance Commission found that Parrish failed to use the funds to pay for the transcript as instructed by his client and, instead, converted the funds for his own use. The commission recommended revocation of Parrish's license. For the reasons stated below, we agree with the commission that Parrish violated ethical rules and suspend his license.

## I. Factual and Procedural Background.

**A. Disciplinary History.** Eric Parrish is a licensed Iowa attorney. He was admitted to practice in 1999. Parrish received ten private admonitions between 2001 and 2013. On three occasions, the private admonitions related to Parrish's failure to provide his clients with itemization of services following his receipt of retainers. On three other occasions, he was privately admonished for neglect when his failure to pay filing fees or take other action caused dismissal of proceedings. On two occasions, he received private admonitions for withdrawing retained funds in excess of fees earned from his trust account. On another occasion, he allowed trust funds in a settled case to fall below the amount of a lien on the settlement funds, thereby failing to protect the rights of a third party to funds in his possession. He was also admonished for neglect in failing to notify clients of an adverse court decision and to inquire as to whether they wished to appeal. Although private admonitions are not discipline, they put a lawyer on notice of deficiencies regarding ethical requirements.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Said*, 869 N.W.2d 185, 194 (Iowa 2015).

In 2011, Parrish's license was suspended for sixty days as a result of misconduct related to trust account violations and mishandling of fees. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 583 (Iowa 2011). Specifically, Parrish withdrew funds from trust accounts before they were actually earned, failed to appropriately account for earned fees, and failed to return the unearned portion of the fees in violation of Iowa Rules of Professional Conduct 32.1.5(a) (prohibiting unreasonable fees), 32.1.15(c) (permitting withdrawal of fees only as they have been earned), 32:1.15(d) (requiring notice to clients after receiving funds and a prompt return of client funds), 32:1.15(f) (incorporating chapter 45 of the Iowa Court Rules, including requirements associated with a contemporaneous written accounting to client), and 32:1.16(d) (requiring return of unearned payments upon termination of representation). *Id.* at 585–88. In addition to violations of our ethical rules, we also found violations of parallel court rules. *Id.*

After his suspension, Parrish received a public reprimand in 2012 for failing to provide contemporaneous billings to clients, including contemporaneous notices when funds were withdrawn, and for delaying the return of unearned fees in violation of ethical rules 32:1.15(d) and 32:1.16(d) and Iowa Court Rule 45.7(4). He was further reprimanded for violating rule 32:1.3 (requiring reasonable diligence) for failing to attend a hearing. Also in 2012, he received a second public reprimand for failing to respond to a demand for information from our disciplinary authorities.

**B. Nature of Complaint.** On September 19, 2016, Taylor Ware filed a complaint with the Board regarding Parrish's conduct. Ware hired

Parrish to represent her in a child custody matter. After an adverse ruling from the district court, she agreed with Parrish to take an appeal.

Ware stated Parrish informed her that in order to appeal she would need to pay $2500 for a transcript. Although Ware had just lost her job, she claimed she arranged to pay for the transcript by asking for support from family and friends. Ware averred, "Eric [Parrish] assured me that he had filed the appeal, was writing a brief, and that as soon as I paid him for the transcripts, he would get them from the [court] reporter."

Although Ware stated she gave Parrish a check for $2467.50 to pay for transcripts—the exact amount billed by the court reporter—the transcripts were never obtained. Sometime later, Ware learned through another attorney that Parrish had not paid for the transcript and that her appeal had been dismissed. According to Ware, "I gave Mr. Parrish a check for $2467.50 for transcripts that were never purchased from the court reporter, and was promised an appeal that was filed, but dismissed."

The Board filed its revised amended complaint on October 13, 2017. According to the complaint, Ware hired Parrish to represent her in a custody modification matter. After the district court awarded primary custody to the child's father on March 23, 2016, Parrish recommended an appeal but told Ware that she would have to advance approximately $2500 to pay for the cost of the trial transcript. The Board alleged that Parrish filed a notice of appeal on April 21, 2016.

The Board further noted that on April 28, Ware wrote Parrish a check for $2467.50 with the notation "Transcript Fees" on the memo line. The Board asserted the specific purpose of the check was to pay the transcript fees. That same day, the Board alleged, Parrish filed the combined certificate in the appeal with this court.

The Board asserted, however, that Parrish converted the $2467.50 received from Ware for his own personal use without a colorable future claim in violation of Iowa Code section 714.1(2) (2016) (prohibiting misappropriation of property held in trust) and section 714.2(2) (prohibiting theft of property valued in excess of $1000 but not exceeding $10,000). The Board further alleged that Parrish falsely told this court in filings on June 17 and July 1 that Ware had not been able to pay the cost of the transcript and needed additional time.

The Board noted that this court dismissed Ware's appeal on August 1. The Board alleged that Parrish did not tell Ware about the dismissal. The Board further asserted that upon dismissal, Parrish had an obligation to return the $2467.50 to Ware.

The Board claimed Parrish's actions violated five of our ethical rules. Specifically, the Board alleged that Parrish violated Iowa Rules of Professional Conduct 32:1.15(d) (requiring prompt delivery and accounting of client funds), 32:3.3(a)(1) (prohibiting knowing false statements to a tribunal), 32:8.4(b) (prohibiting criminal acts reflecting adversely on honesty, trustworthiness, or fitness), 32:8.4(c) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), and 32:8.4(d) (prohibiting conduct prejudicial to the administration of justice).

On October 25, 2017, Parrish filed an answer to the Board's revised amended complaint. Parrish denied that Ware's April 28, 2016 check for $2467.50 was for the specific purpose of paying the transcript fee. Among other things, Parrish affirmatively alleged that "Ware wrote 'Transcript,' 'Fees' on the memo line of the check." He further affirmatively alleged that under the terms of his agreement with Ware, he earned his fee upon receipt and, as a result, he had no obligation to hold the money received from Ware on April 28 in trust. Parrish denied that he committed any of the

ethical violations alleged in the Board's revised amended complaint. Parrish also filed a notice pursuant to Iowa Court Rule 36.8(1) and (2), asserting that he had a colorable future claim of right for the funds.

### C. Proceedings Before the Commission.

1. *Evidence presented at hearing.* The commission held a hearing on the matter on November 13 and 14, 2017. The commission heard testimony from Ware and Parrish. It also received a variety of exhibits from the Board showing Parrish's prior admonitions and discipline, communications between Ware and Parrish, and filings made by Parrish in this court related to the appeal of the child custody matter. Parrish offered exhibits showing his communications with Ware and documents related to his medical condition.

2. *Commission ruling.* The commission found that Parrish and Ware entered into a $5000 flat fee agreement for representation in the custody modification trial and a $2500 flat fee agreement for representation in the appeal. The commission found that after the notice of appeal was filed on April 21, 2016, Parrish was notified by the court reporter that the exact cost of the transcript would be $2467.50. Parrish forwarded the figure to Ware.

The commission found that on April 27, Ware texted Parrish that she was able to pay the money for the transcript because of help provided from her grandmother as a result of the grandmother's income tax refund. The next day, Ware wrote a check payable to the Polk County Courthouse but texted Parrish to confirm the appropriateness of the payee on the check. The commission found that Parrish responded by informing Ware to make the check payable to him because the court reporter issued the billing statement in Parrish's name. Ware then issued a new check payable to Parrish in the amount of $2467.50 and wrote on the memo line

of the check "Transcript Fees." According to the commission, Ware understood that the amount would be placed in Parrish's trust account and that Parrish would use the funds to pay the court reporter.

According to the commission, Parrish did not put the funds in his trust account and did not pay the court reporter. As a result, no transcript was prepared. Nonetheless, the commission found that Parrish filed a combined certificate with this court certifying that he did "order" the transcript and that "[n]o arrangements have been made or suggested to delay the preparation thereof." The commission noted that Parrish knew that before commencing preparation of the transcript, the court reporter required the transcript fee be paid in full. The commission further found that on June 17 and July 1, Parrish advised the court that Ware had been unable to raise the necessary funds but that he expected Ware to have the necessary funds in fourteen days or by the end of the week. Ultimately, the commission noted that the appeal was dismissed by this court on August 1.

The commission found that Parrish did not notify Ware of the pleadings or orders concerning the status of the appeal, including the dismissal of the appeal. Further, the commission found that Parrish did not reimburse Ware in the amount of $2467.50.

The commission considered and rejected Parrish's contention that the $2467.50 was a payment in full of his $2500 flat fee for handling the appeal. The commission noted that the check referenced "Transcript Fees," and was written for the precise amount of the cost of the transcript. Further, the commission noted that texts prior to April 28 expressly referred to the need for funds for the transcript while the texts after April 28 do not mention transcript costs but only attorney fees. Finally, to the

extent there was a conflict in testimony, the commission found Ware credible.

The commission also addressed Parrish's attempt to explain his actions by suggesting that he used a fee structure devised to reduce the possibility of trust account violations. The commission found that the fee structure had no bearing on the proceeding, as the $2467.50 payment to Parrish was specifically intended for transcript costs and not for Parrish's attorney fees.

In light of its factual findings, the commission found numerous ethical violations. The commission found violations of Iowa Rules of Professional Conduct 32:8(4)(b) and 32:8(4)(c). The commission found that Parrish had no colorable future claim for funds given to him for a particular purpose other than attorney fees. As a result, according to the commission, a severe sanction is appropriate. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Guthrie*, 901 N.W.2d 493, 500–01 (Iowa 2017).

The commission recognized that in order to find a violation of rule 32:8(4)(c), there must be a finding of scienter rather than mere negligence. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Haskovec*, 869 N.W.2d 554, 560 (Iowa 2015). The commission concluded that Parrish knew the check from Ware was for the specific purpose of paying the transcript fee, not for his legal representation. The commission further reasoned that Parrish converted the funds for his own personal use when he failed to pay for the transcript and lied to Ware and to this court regarding payment status of the transcript. As a result, the commission found that Parrish committed theft by misappropriation in violation of Iowa Code sections 714.1(2) and 714.2(2) when he converted the $2467.50 for his own personal use.

The commission recognized that when an attorney misappropriates funds to which he did not have a colorable claim, it is unnecessary to

discuss the other rule violations in detail or consider aggravating or mitigating factors. *Guthrie*, 901 N.W.2d at 500. Nonetheless, the commission briefly considered other ethical violations. The commission concluded Parrish violated rules 32:1.15(d), 32:3.3(a)(1), and 32:8.4(d).

The commission also catalogued mitigating and aggravating factors. As mitigating factors, the commission rejected the notion that Parrish's mental health status mitigated accountability for his actions. The commission noted Parrish testified that his mental health issues were "well controlled."

On the other hand, the commission found a number of aggravating factors. The aggravating factors found by the commission included Parrish's multiple violations of ethical rules; his history of private admonitions, public reprimands, and prior suspension; his prior discipline for similar misconduct; his substantial experience in the practice of law; his refusal to show remorse or admit wrongful conduct; and his uncooperative course of conduct throughout the disciplinary proceedings.

The commission recommended revocation of Parrish's license to practice law. It also recommended Parrish reimburse $2467.50 to Ware.

**D. Preliminary Appellate Proceedings.** Parrish filed a notice of appeal. He sought to remand the case to expand the record regarding mitigating factors. This court denied the remand. Parrish also filed a motion with this court to answer what he characterized as a "certified question"; namely, whether a formal retirement under Iowa Rule of Professional Conduct 39.7(2) would impact the current appeal and disciplinary action in this case. We ordered the parties to address the matter in their briefs on the merits.

Parrish, however, failed to file a timely brief even though we extended the deadline for briefing. We ordered the matter submitted to

the court without briefing pursuant to Iowa Court Rule 36.21. Under rule 36.21, the parties may file statements in support or opposition to the sanction recommended by the commission. Neither party filed a sanctions statement.

We have found no provision in our disciplinary rules for this court to answer "certified questions" posed by an attorney related to pending disciplinary proceedings.[1] In any event, a lawyer may not avoid the disciplinary process involving a potential revocation of the lawyer's license through a strategy of voluntary retirement. *See* Iowa R. Prof'l Conduct 34.10(1); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelsen*, 807 N.W.2d 259, 265 (Iowa 2011).

## II. Standard of Review.

In cases submitted pursuant to Iowa Court Rule 36.21, our review is de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 101 (Iowa 2012). In our de novo review, we give respectful consideration to the grievance commission's findings but are not bound by them. *Id.* In proceedings under our ethical rules, "[t]he Board must prove attorney misconduct by a convincing preponderance of the evidence, a burden greater than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weiland*, 862 N.W.2d 627, 634–35 (Iowa 2015). The burden of proof is less than the clear and convincing evidence standard that is ordinarily the highest burden of proof in a civil proceeding. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 517 (Iowa 1996) (per curiam).

---

[1]Parrish cites a nonexistent Iowa Code chapter 645A. He may have intended to cite Iowa Code chapter 684A, which authorizes the supreme court to answer certified questions presented to it from various courts.

In proceedings under Iowa Rule of Professional Conduct 36.21, we review only the commission's report and the record made before the commission. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Mathahs*, 918 N.W.2d 487, 492 (Iowa 2018). Although the parties are entitled to file a statement in support or opposition to the commission's recommended sanction, *see id.*, neither party filed a sanctions statement in this matter.

### III. Discussion.

### A. Legal Framework.

1. *The distinction between misappropriation of client funds and violation of trust regulations under future claim of right.* Before we analyze the individual charges brought by the Board, we present an overview of relevant caselaw. In particular, we note that the caselaw establishes that there is a question whether a colorable *future* claim in funds provides a potential defense for alleged misappropriation or conversion of client funds entrusted to an attorney for a particular purpose.

At the outset, we note that in cases involving misappropriation of client funds, we generally impose the severe sanction of revocation. *Guthrie*, 901 N.W.2d at 500–01 ("[I]n nearly every case where an attorney converts client funds without a colorable future claim, we revoke the attorney's license to practice law."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thomas*, 844 N.W.2d 111, 117 (Iowa 2014) ("The amount of money an attorney converts does not lessen the sanction."); *Comm. on Prof'l Ethics & Conduct v. Ottesen*, 525 N.W.2d 865, 866 (Iowa 1994) ("There is no place in our profession for lawyers who convert funds entrusted to them. It is almost axiomatic that we revoke licenses of lawyers who do so.").

On the other hand, the failure to follow the rules governing retainer fees normally results in a less severe sanction. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cepican*, 861 N.W.2d 841, 844 (Iowa 2015). For

example, a lawyer who has earned a fee but has taken it without the necessary court approval may have his license suspended for trust account violations but not revoked for stealing. *Comm. on Prof'l Ethics & Conduct v. Rauch*, 486 N.W.2d 39, 40 (Iowa 1992) (per curiam). In addition to cases in which fees were taken without required approval, the doctrine of future colorable claim has been extended to situations in which an attorney paid his fees from client funds before they were earned. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCann*, 712 N.W.2d 89, 97 (Iowa 2006).

The critical difference between whether a lawyer has committed theft, thereby inviting license revocation, or merely violated trust account requirements that may result in a lesser sanction, often depends upon whether the attorney had a colorable future claim to the funds. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carter*, 847 N.W.2d 228, 232 (Iowa 2014). While the Board has the burden of showing that a misappropriation of funds occurred, the attorney has the burden of providing evidence of a colorable future claim to the funds. *Cepican*, 861 N.W.2d at 844.

In *Carter*, we engaged in analysis of the colorable future claim doctrine. *Carter*, 847 N.W.2d at 233–34. After surveying the cases, we observed that the colorable future claim doctrine "broadly applies to the premature conversion of client funds *intended as attorney fees*, as opposed to the conversion of client funds with no future claim of right to the funds." *Id.* at 233 (emphasis added). The *Carter* court further noted that we have generally been more willing to allow the colorable future claim doctrine to shield an attorney from revocation when the premature fee claims exceed the actual fee earned "if the funds converted were retainer funds." *Id.* at 233–34. We observed that because the purpose of retainer funds is to pay future attorney fees, "the conversion of retainer funds by an attorney can

be consistent with a claim that the funds were intended to be earned as fees." *Id.* at 234. In refusing to recognize a future claim of right in trust funds in one matter, the *Carter* court noted that the lawyer converted funds from a trust account that were not held as a retainer or an advance fee. *Id.* at 234. The *Carter* court additionally noted that the lawyer converted the funds in a fashion inconsistent with an intent to take the funds as estate fees. *Id.*

2. *Disciplinary cases involving taking of fees held for a specific purpose.* In *Committee on Professional Ethics & Conduct v. Nadler*, 445 N.W.2d 358, 361 (Iowa 1989), we considered a case in which a client forwarded $500 to an attorney to settle a matter. Upon receiving the funds, the attorney asked for payment of outstanding fees, but no money for that purpose was forthcoming. *Id.* The attorney retained the $500 intended to settle the claim as an attorney fee. *Id.* In support of his action, the attorney relied upon Iowa Code section 602.10116(2) (1987), which provided that "[a]n attorney has a lien for a general balance of compensation upon . . . [m]oney in the attorney's hands belonging to the client." *Id.* (alteration in original).

In *Nadler*, we declared it "unthinkable that a lawyer would satisfy a fee bill out of funds entrusted by a client for the express purpose of settling a lawsuit." *Id.* We noted that the general rule is that "[p]roperty or funds delivered for a special purpose by a client to his attorney cannot constitute the subject matter of a retaining lien in favor of such attorney." *Id.* (alteration in original) (quoting 7A C.J.S. *Attorney & Client* § 377, at 745 (1980)). We held that "[b]y keeping his client's money instead of applying it to the purpose for which he received it, [the lawyer] clearly failed to seek the lawful objectives of his client and prejudiced his client's cause" in violation of our disciplinary rules. *Id.* We suspended the lawyer's license

indefinitely with no possibility of reinstatement for one year. *Id.* at 362. The *Nadler* case did not involve an allegation of theft or misappropriation of client funds.

Another case of interest is *Iowa Supreme Court Attorney Disciplinary Board v. Powell,* 830 N.W.2d 355 (Iowa 2013). In *Powell,* the attorney was charged with violating Iowa Rule of Professional Conduct 32:1.15 for failing to segregate trust funds into a separate account, Iowa Court Rule 45.1 for failing to deposit client funds into the trust account, rule 45.2(2) for failing to maintain complete trust account records and make full accountings, and rule 45.7 for failing to notify clients of the withdrawal of advanced funds. *Id.* at 356–57.

In *Powell,* one of the specific trust fund violations arose from Powell's use of "client funds placed in his trust account for the purpose of paying a property settlement and the attorney fees of opposing counsel pursuant to a stipulated decree for dissolution of marriage to pay his own attorney fees." *Id.* at 357. We generally concluded that "the evidence failed to support a finding that Powell had no colorable claim to the funds he removed from his trust account or failed to place in his trust account." *Id.* at 358. This language in *Powell* suggests a claim of right is a mitigating factor in trust account violations. *See id.* Notably, however, the board did not charge Powell with a violation of Iowa Rule of Professional Conduct 32:8.4(b) or (c). *See id.* at 356.

In *Iowa Supreme Court Attorney Disciplinary Board v. Morse,* 887 N.W.2d 131, 133 (Iowa 2016), we considered a case in which a lawyer obtained funds from clients for the specific purpose of paying for a transcript but the lawyer failed to forward the funds to the reporter, and as a result, the appeal was dismissed. In *Morse,* the lawyer deposited $1400 forwarded to him to pay for a transcript into his trust account. *Id.*

at 136. Another check from the same client of $500 to pay for attorney fees was returned for insufficient funds. *Id.* The lawyer asserted that he did not pay the court reporter from his trust account for fear that the $1400 check would also be returned. *Id.*

Ultimately, the clients' appeal in *Morse* was dismissed for failure to make arrangements to provide a transcript. *Id.* at 137. After the appeal was dismissed, the lawyer applied the $1400 against the balance of attorney fees owed by the client. *Id.* The board charged that by so doing, the lawyer violated a number of our disciplinary rules, including rules 32:1.15(d), 32:1.15(e), 32:1.3, and 34:8.4(d). *Id.* at 138. The commission found violation of all of these ethical rules, *id.*, and so did we, *id.* at 139–43.

In *Morse*, we emphasized that when an attorney receives funds for a specific purpose, this understanding supersedes any claim or attorney lien the attorney may have in the funds. *Id.* at 139. We noted in *Morse* that *Nadler* established that "an attorney cannot allow a fee claim to conflict with the lawyer's obligation as trustee." *Id.* (alteration omitted) (quoting *Nadler*, 445 N.W.2d at 361). As a result, in *Morse,* we found a violation of rule 32:1.15(d) that, among other things, required a lawyer to promptly deliver funds to third parties (the court reporter) that the third party is entitled to receive. *Id.* at 139–40 In addition, we also found that Morse violated rules 32:1.15(e), 32:1.3, and 32:8.4(d). *Id.* at 140–43.

In determining the appropriate sanction, we considered whether the attorney has a colorable claim to fees. *Id.* at 146. We noted that in a prior case, we found an attorney who prematurely withdrew a probate fee "had a colorable claim to these fees, once the estate was closed." *Id.* (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 62 (Iowa 2009)). We noted in *Morse* that the attorney had a colorable *present* claim

to the funds because his earned fees exceeded the amount of client funds taken by the attorney. *Id.*

3. *Requirement of scienter.* Under our caselaw, the Board must establish some level of scienter beyond mere negligence to establish a misappropriation or theft of a client's funds under rule 32:8.4(c). *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 462 (Iowa 2014). Scienter generally "requires that the attorney acted knowingly, intentionally, or with the aim to mislead." *Guthrie*, 901 N.W.2d at 498. Nonetheless, an attorney's "casual, reckless disregard for the truth" also establishes a violation of the rule. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 656 (Iowa 2013) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Isaacson*, 750 N.W.2d 104, 109 (Iowa 2008)).

In considering scienter, it is immaterial that an attorney has not been charged with a crime. *Thomas*, 844 N.W.2d at 116; *Comm. on Prof'l Ethics & Conduct v. Hall*, 463 N.W.2d 30, 35 (Iowa 1990). The standard of proof in a disciplinary proceeding is lower than in a criminal proceeding, and its purpose is to protect the public and not to punish the lawyer. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Green*, 888 N.W.2d 398, 404 (Iowa 2016).

**B. Review of Factual Findings of the Commission.**

1. *Introduction.* Based on our de novo review of the record, we agree with the factual findings of the commission in their entirety. Many of the factual findings of the commission were undisputed. We address below in detail only three factual issues that were contested at the hearing before the commission.

2. *Purpose of $2467.50 check.* The first factual issue surrounds the purpose of the $2467.50 check delivered to Parrish by Ware on April 28.

The Board asserts that Ware paid the funds specifically to pay for preparation of the transcripts, while Parrish claims that the funds were given to him to satisfy his requirement of a $2500 retainer to handle the appeal of the child custody matter.

This factual distinction is consequential. If the funds given to him on April 28 were a retainer to pay for attorney fees, Parrish could at least argue that he had a colorable future claim of right in the funds for work to be done on the appeal, thereby lessening the possibility of receiving harsh sanctions. *Carter*, 847 N.W.2d at 233. On the other hand, if the funds were given to Parrish for a particular purpose, any future claim of right would be undermined. *See id.* at 233–34. While a lawyer might be able to claim that the premature withdrawal of retainer funds was only a question of timing when there was a future claim of right to the funds, that argument is more difficult to make when the funds given to the lawyer have a restricted use that does not include payment of attorney fees. *See id.*

We think it abundantly clear that Ware advanced the $2467.50 for the specific purpose of paying for the transcript for her appeal in the custody matter. Ware's testimony was firm and consistent on this point. Further, it is striking that the check was made out in the exact amount to the penny requested by the court reporter and Ware specifically wrote "Transcript Fees" on the memo line of the check. Moreover, Ware's understanding of the urgency of obtaining transcript funds is reflected by Ware's successful effort to convince her grandmother to advance to Ware money from her income tax refund to pay for it.

If that is not enough, contemporaneous text traffic between Ware and Parrish forecloses us from coming to any other conclusion. For example, Parrish advised Ware on April 20 that he would get back to her

"on the exact cost once [he] hear[d] back from the court reporter." The next day, Ware asked Parrish how long she had to come up with "the transcript fee." Parrish responded that they had seven days from the notice for the combined certificate because in the combined certificate he had to certify ordering the transcript and making arrangements to pay for it. Ware thus knew that she needed to raise the necessary funds for the transcript quickly in order to prosecute her appeal.

On April 27, Ware texted Parrish, "We've got the money for the transcripts." After asking about the rest of the outstanding balance, an apparent reference to attorney fees, Parrish asked Ware, "How do you want to take care of the transcripts? Do you want to pay the court reporter directly or go through me?" Having told Parrish she had the money to pay for the transcript, Ware responded to Parrish that she was still working on the outstanding balance and that she and Parrish had an agreement that she would make payments. Parrish responded by stating, "And there is an additional price for the appeal [I am] writing." Ware texted she understood and was working on that as well.

Later in the afternoon of April 27, Parrish texted Ware, "Going to take care of transcripts? Do you want to give me the money and I pay for them?" In response, Ware stated, "I'll give you a check for it tomorrow." When Ware asks about whether she and Parrish had to meet "there" to make the payment, Parrish responded, "Just give me the check and I'll get it to her."

Parrish and Ware arranged to meet the next day at a coffeehouse. Ware originally made out the check to the Polk County Court. When she asked Parrish in a text if that was correct, Parrish told her, "No, I'll put the payment in my trust account because I am the one who has to pay as the bill is directed to me."

Ware and Parrish met at the coffeehouse the following day on April 28. Ware gave Parrish a check in the amount of $2467.50 with the phrase "Transcript fees" written in the memo line of the check.[2]

After April 28, Parrish sent Ware a series of texts asking for payment. On May 6, Parrish texted Ware, stating, "Some payment needs to be made today. Appeal is progressing." On May 24, Parrish sent another text, stating, "I need to have payment on your outstanding balance. Thx."

On May 26, Parrish texted, "Extremely helpful if you could get a payment in on your account today. I'm trying to get out of town to my sons graduation. There's no one you can borrow money from?" Later in the day, Parrish sent to Ware a recap of account balances, "Modification: $1,000 Appeal: $2500." On June 20, Parrish sent Ware a text, stating, "I need a payment today. $800 balance on one. $2500 balance on the other."

The May 26 and June 20 texts demonstrate beyond question that Parrish understood the $2467.50 paid by Ware was for the purpose of paying for the transcript and not for satisfying his $2500 flat fee for the appeal or the outstanding balance on fees owed for the modification action in district court. If the April 28 check had applied against outstanding balances, there would not be a $2500 balance owed on the appeal and an $800 balance on modification fees.

Further, in contrast to the period prior to April 28, i.e., before Ware presented her $2467.50 check, Parrish did not demand payment of the transcript fees after April 28. When this court entered an order on June 9 declaring that Ware must pay the court reporter for the transcript within seven days or face dismissal, Parrish did not communicate the substance of the order to Ware. Instead, on June 10, he texted her, stating, "There

---

[2]The texts prior to April 28 occasionally mention payment of the appeal filing fee of $150. After April 28, however, there is no further mention of the filing fee.

needs to be a concerted effort to get the remainder of balance for trial and appeal in the next five (5) days." In this text, Parrish is seeking to collect attorney fees, not funds to pay the court reporter for the transcript of the modification proceeding. He does not mention the need to pay the court reporter for transcripts. Nor does he tell Ware that her appeal could be dismissed at this point for failure to pay for the transcript. And, on June 14, Parrish texted Ware, "I'm not trying to come down on you at all. Accounting just gets on me about carrying high balances on flat fees." Plainly, Parrish was afraid of telling Ware that her case was about to be dismissed for failure to pay the court reporter.

Similarly, when this court entered an order on July 12 extending the time for paying the court reporter for seven days but noting that dismissal would occur if Ware failed to pay the court reporter, Parrish again did not advise his client of the status of the appeal. He was silent. Then, when the appeal was dismissed on August 1, there was no communication with the client advising her of that fact or of the basis for the dismissal. Parrish's refusal to inform Ware of the substance of the July 12 order supports the notion that Parrish knew that Ware believed the purpose of the April 28 check for $2467.50 was to pay for the transcript.

Other aspects of Parrish's testimony regarding the purpose of the $2467.50 check are simply incredible. Parrish stated that at the April 28 coffeehouse meeting, despite his own acknowledgment that "[Ware] tried to give [him] one check for the transcript," he and Ware agreed that the funds would be applied against outstanding fees rather than used to obtain the transcript. In support, he asserts that he instructed Ware that she "need[ed] to write 'fee'" on the memo line of the check. By changing the memo from "Transcript" to "Transcript fees," he contends, he had no

obligation to use the funds to pay for the transcript but was entitled to use the funds to pay for his flat fee on appeal.

We find the notion that Ware added the word "fee" to the memo on the check to allow Parrish to apply the funds to account balances is unsupported by the record. Ware, of course, denies that such a modification of the memo on the check took place. Further, if using the funds for something other than transcript fees was agreed to by the parties, another check would have been written without the "Transcript fees" memo or at least the memo on the check would have been crossed out or obliterated in some way. We simply do not believe Parrish would have thought that he would be entitled to apply the funds to outstanding fee balances by instructing Ware to change the memo on the check from "Transcript" to "Transcript fees."

In sum, we conclude the Board proved by a convincing preponderance of the evidence that the purpose of the $2467.50 payment was to pay for transcript fees and not, as Parrish contended, to pay for attorney fees. Further, the undisputed facts show that Parrish did not place the funds in his trust account and did not use them to pay for the transcript. He simply cashed the check.

3. *Nature of underlying fee agreements: flat fee or general retainer.* The parties disputed the nature of the underlying fee agreements between Ware and Parrish. The Board asserted there was no written fee agreement but that the parties understood that Parrish would charge a traditional flat fee for his services. Parrish asserted that services were provided to Ware under a type of general retainer agreement. Parrish offered a blank, unsigned form bearing the label "General 'Flat Fee' Retainer" into evidence. Under the "General 'Flat Fee' Retainer" agreement offered by Parrish, services are not provided for particular matters but on an as-needed basis

over a specified period of time. Fees paid under the general retainer agreement are earned on receipt. In this case, if Parrish were operating under a general retainer agreement with Ware, he might be able to claim that the $2467.50 he received from Ware was immediately earned upon receipt, thereby establishing a *present* colorable claim for the funds. *See generally Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Apland*, 577 N.W.2d 50, 54 (Iowa 1998) (describing general retainers). Of course, any such claim would need to overcome our presumption against general retainers. *See id.* at 57.

We conclude, based on our examination of the entire record, that Parrish did not have a general retainer agreement with Ware at any time. In fact, there was no written agreement between Ware and Parrish. In the text messages with Ware, Parrish simply referred to the fee arrangement as a flat fee. The text messages never used the term retainer and made no mention of a limited term for representation. Ware and Parrish simply agreed to a flat fee of $5000 for the custody modification trial and, later, $2500 for the appeal.

The fact that Parrish and Ware did not have a general retainer relationship is borne out by Parrish's response to the initial inquiries from the Board after Ware filed her complaint. In response to the Board's investigation of Ware's complaint, Parrish told the Board on November 14, 2016, that he and Ware had agreed "on a flat fee of $5,000 for representation at her modification trial" and "a $2500 flat fee should an appeal become necessary." He made no mention at all of a general retainer agreement. Further, Parrish attached a copy of his standard flat fee agreement in response to the Board's investigation. The blank form was a traditional flat fee agreement, not a general retainer agreement.

In proceedings before the commission, however, Parrish changed course, suggesting that he "mistakenly" produced the traditional flat fee form. Instead, he took the position that his relationship with Ware was really reflected by the unsigned, uncompleted "General 'Flat Fee' Retainer" agreement that Parrish introduced as part of an exhibit at the hearing.

We find Parrish's testimony on this point incredible. Ware had a specific problem; namely, a child custody problem and, later, an appeal. While Parrish gave advice and took action related to various Iowa Department of Human Services proceedings, police reports, and a protective order, all these events were related to the underlying child custody proceeding. When Parrish demanded an additional $2500 for the appeal, he characterized the appeal as a "separate matter." According to Parrish, there was "an additional price for the appeal [he was] writing." Later, Parrish noted that the amounts owed by Ware were "for trial and appeal." After the appeal was dismissed, Parrish told Ware that she "never paid for [her] appeal." While Parrish claimed during the hearing that it is much easier for him to say to clients, "It's not tied to a single matter, . . . whatever comes up is what I'll deal with with the clients and for a specific time period," there is no support for such an assertion in the contemporaneous text record in this case.

Parrish submitted an exhibit that included a one page memo dated March 23, 2016, and a blank, unsigned copy of Parrish's "General 'Flat Fee' Retainer" attorney fee contract. The one page memo to Ware advised her that the district court had ruled against her on the modification. The one page memo begins by stating, "Attached is the Court's ruling on the modification." There is no reference in the one page memo to an attached attorney fee contract. On April 21, Parrish texted Ware and stated, "I do want you to realize that taking this appeal is a separate matter from the

district court case." There is no mention, however, in the April 21 text or in any other text between Ware and Parrish, of the fee contract attached to Parrish's exhibit.

Moreover, the blank, unsigned form—carrying the interesting description "General 'Flat Fee' Retainer" advanced by Parrish as governing the relationship between Parrish and Ware—has a twelve-month term. Parrish's representation of Ware began in January. If the term of the original agreement between Ware and Parrish was a general retainer for a twelve-month period, there would have been no need for another fee agreement three months later to cover the appeal after the adverse ruling of the district court in March. Parrish claimed that the term of the first $5000 flat fee agreement "was probably, like, three or four months." Aside from Parrish's testimony, the record does not support his assertion that the original agreement between Parrish and Ware was a general retainer of limited duration.

In light of the record developed in this case, we simply cannot find that an uncompleted and unsigned form of questionable provenance structured the attorney–client relationship between Ware and Parrish. Although Parrish claims that he provided Ware with the only copy of the fee agreement for her records and suggests the term of the agreement was for three or four months, we find it highly unlikely an attorney would not maintain a file copy of such a written fee agreement if both parties had signed it.[3]

---

[3]Ware did testify that she received a fee agreement of some kind from Parrish. She testified that it was not signed and that they had no discussion about it. She indicated that the fee agreement was in the exhibits. The fee agreements in the exhibits include both a blank copy of Parrish's standard flat fee agreement and a blank copy of Parrish's attorney fee contract characterized as a "General 'Flat Fee' Retainer." Ware did not identify in her testimony which document she received, but she maintained throughout the proceeding that she agreed to pay Parrish on a flat fee basis. In any event, no signed copy of any fee contract was introduced into evidence.

We conclude that the Board proved by a convincing preponderance of evidence that the legal services provided by Parrish to Ware were pursuant to flat fee agreements, $5000 for the trial of the custody matter and $2500 for the appeal of the case. There were no general retainer agreements between Ware and Parrish.

4. *Scienter.* In cases involving alleged violations of rule 32:8.4)(b) and (c), the Board must prove scienter. *See McGinness,* 844 N.W.2d at 462. The evidence in this case establishes that Parrish knew that the $2467.50 given to him by Ware was for the specific purpose of paying for the transcript. Certainly the memo on Ware's check and the text traffic surrounding the payment demonstrate that Parrish knew that the check was offered for the limited purpose of paying for the preparation of the transcript.

Further, Parrish knew that he was providing legal services to Ware through a flat fee agreement of $5000 for the custody modification proceedings and, later, $2500 for the appeal. He knew that when Ware delivered the check to him on April 28, he had at most $1100 in earned fees related to the modification action in district court and no earned fees in connection with the appeal. After he cashed the April 28 check, he texted Ware that she still owed him an $800 balance for the custody modification and $2500 for the appeal. He did not reduce the balance owing for the appeal by $2500. He knew that the April 28 funds were not in payment of attorney fees.

Parrish also knew that he did not have a signed general retainer fee agreement. The contemporaneous text traffic between Ware and Parrish, as noted above, is totally devoid of any suggestion that his representation of her was limited in time or was general in nature. Parrish came up with

the theory that Ware agreed to the general retainer agreement in order to buttress his defense to the pending disciplinary proceedings.

We find that the Board has established by a convincing preponderance of evidence that Parrish had knowledge of the above facts.

**C. Analysis of Disciplinary Violations.** We first consider whether Parrish violated rule 32:8.4(b) and (c) by committing a theft of client funds. We note that Iowa Code section 714.1(2) (2016) provides that a person

> commits theft when the person . . . [m]isappropriates property which the person has in trust . . . by using or disposing of it in a manner which is inconsistent with or a denial of the trust or of the owner's rights in such property.

Based on our review of the record, it is clear that Parrish knew the funds given to him by Ware on April 28, 2016, were for a limited purpose. Nonetheless, he cashed the check on the day it was received, did not place the funds in trust, and did not pay the court reporter for the preparation of the transcript needed for the appeal. There is no question that by using the transcript funds for other than their intended purpose, Parrish violated ethical rules related to proper handling of client funds. In order to determine whether Parrish violated rule 32:8.4(b) and (c), however, we must consider whether Parrish has validly asserted a colorable future claim of right to the funds.

In *Morse,* which involved $1400 that had been given to an attorney to cover court reporter fees, we said, "We consider whether the attorney has a colorable claim to the fees." *Morse*, 887 N.W.2d at 146. We noted that "Morse clearly had a colorable present claim to the $1400—he was owed more than that in past-due legal fees." *Id.* In *Morse,* however, there were no allegations of theft or misappropriation under rules 32:8.4(b) and (c). *See id.* at 138 (describing the board's complaint as alleging violations of rules 32:1.3 (due diligence), 32:1.15(d) and (e) (safekeeping property),

and 32:8.4(d) (conduct prejudicial to the administration of justice)). Nothing in *Morse* stands for the proposition that in a misappropriation case a lawyer may assert a future claim of right when a lawyer takes funds entrusted to him for a specific purpose as a fee.

We think that when a lawyer takes client funds provided for a special purpose, the future claim of right defense is inapplicable. Our conclusion is consistent with the reasoning presented in *Carter*, 847 N.W.2d at 233–34. In *Carter*, we noted that when funds are entrusted to a lawyer for the specific purpose of paying for future fees, a premature taking of those fees is subject to the defense of a future claim of right. *Id.*

In this case, Ware did not pay the funds to Parrish as a retainer for future attorney fees. The funds were provided for the specific purpose of paying for the transcript and not paying for future fees. The question of conversion of the funds is not one of mere timing, but of substance. Under the circumstances, we do not think the future claim of right doctrine is applicable. There is no future claim of right to use funds provided for a particular purpose to instead pay for attorney fees a lawyer reasonably believes will be incurred in the future.

The commission concluded that a future claim of right simply did not apply when funds are given to an attorney by a client for a particular purpose. It did not consider whether a lawyer who converts trust funds for a particular purpose may assert as a defense a present claim of right for the funds arising from earned fees. The approach of the commission seems to be that with respect to client funds advanced for a particular purpose, any personal use of the client funds contrary to the limitations imposed by the client amounts to a misappropriation or theft. This is a tenable position in light of the language in *Carter* emphasizing the purpose for which the funds are entrusted to the lawyer. *Id.*

In any case, Parrish only had an outstanding earned balance of $1100 related to his representation of Ware in the custody proceeding in district court on April 28 when he received the client check for $2467.50. Even assuming he had a present claim of right for earned fees on April 28, the funds given him by the client exceed that amount by a substantial margin. Further, Parrish claimed in the proceedings before the commission that he applied these fees not against his earned fees arising from the district court proceeding, but against fees related to the future appeal.

The problem with Parrish's theory is that at the time Parrish received the funds there were literally no earned fees related to the appeal. While he may have had $1100 in earned fees related to the district court proceeding at the time he received the transcript fee check from Ware, the amount of the check retained by Parrish far exceeded that amount. Parrish sought to avoid his lack of earned fees by claiming he had a general retainer agreement, and as a result, his fees were earned when he received them and not when he completed legal work. As indicated above, however, we have found that Ware and Parrish were not operating under a general retainer but instead simply had a traditional flat fee agreement.

Under this analysis, Parrish violated rule 32:8.4(b) and (c) by converting client funds entrusted to him for a specific purpose. Assuming that he could assert a defense of a colorable present claim of right for his earned fees, the amount converted, $2467.50, was far in excess of the unpaid earned fees associated with the custody proceeding in district court, $1100.

Yet, we are concerned that our prior cases at least suggested that a future colorable claim of right might prevent a finding of misappropriation or theft. For example, Iowa Court Rule 36.8(1) requires that in cases

involving misappropriated or converted client or third party funds, the Board must allege misappropriation or conversion "without a colorable future claim." Iowa Ct. R. 36.8(1). The rule itself does not distinguish between retainer funds or limited use funds. In *Powell*, some of the claims of mishandling client funds related to limited use payments but we generally stated that the evidence failed to show a lack of future claim of right. *Powell*, 830 N.W.2d at 357–59. In *Carter*, we stated that "[w]e have generally been more willing to allow the colorable future claim to continue to shield an attorney from revocation when the premature fee claim exceeds the actual fee earned if the funds converted were retainer funds." *Carter*, 847 N.W.2d at 233–34. Yet, in *Carter*, we did not explicitly and unequivocally close the door on a colorable future claim of right defense.

In the disciplining process, we believe lawyers are entitled to fair notice of what might lead to serious discipline, particularly when license revocation is a potential sanction. *See Cepican*, 861 N.W.2d at 844. Because our prior cases suggested but did not clearly and unequivocally hold that a future colorable claim of right was not a defense to a claim of theft of misappropriation when limited use client funds are involved, we decline to find, in this case, that a theft or misappropriation occurred. At the time he cashed the check for transcript fees, Parrish had a future colorable claim of right that exceeded the amount of the check.[4] We therefore consider Parrish's transgression as involving violations of our trust account regulations involving safekeeping of client funds. *Carter*, 847 N.W.2d at 232. We want to make it clear, however, that in future cases concerning specific purpose funds, a future colorable claim of right

---

[4]The Board did not claim that after the appeal was dismissed, Parrish was obligated to return the unearned portion of the fees.

will not be a defense to a charge of theft or misappropriation. In that sense, our holding here is prospective only.

Aside from theft or misappropriation, it is clear that Parrish engaged in numerous ethical violations. Parrish plainly violated rule 32:1.15(d) by not promptly forwarding the transcript fee to the court reporter. *See Morse*, 887 N.W.2d at 139. He violated rule 32:3.3(a) when he made brazenly false statements to this court stating that his client had not yet been able to raise funds for the transcript but was attempting to raise the funds. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Vandel*, 889 N.W.2d 659, 665–66 (Iowa 2017). He violated rule 32:8.4(d) when he caused court proceedings to be delayed, and ultimately dismissed, for failure to pay the transcript fee. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 796 N.W.2d 910, 914 (Iowa 2011).

**D. Sanction.**

1. *Mitigating factors.* We begin with a brief discussion of mitigating factors. Parrish urges consideration of his mental health diagnoses as a mitigating factor in this case. There is no point in discussing the details contained in his medical files on the public record here. As the commission has pointed out, Parrish testified that his mental health problems were "well controlled." Further, our careful examination of the record does not show a linkage between any asserted mental health conditions and Parrish's ethical violations in this case as required for us to consider his mental health condition a significant mitigating factor. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Grotewold*, 642 N.W.2d 288, 295–96 (Iowa 2002).

2. *Aggravating factors.* There are several important aggravating factors. "[T]he prior disciplinary history of an attorney is a factor we must consider in imposing discipline." *Parrish*, 801 N.W.2d at 589; *see also*

*Vandel*, 889 N.W.2d at 669 (reviewing prior disciplinary history as aggravating factor); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Baldwin*, 857 N.W.2d 195, 214–15 (Iowa 2014) (same). Parrish has a history of prior admonitions, public reprimands, and a prior license suspension, all of which are aggravating factors. *See Parrish*, 801 N.W.2d at 589–90 (noting Parrish's prior disciplinary history and suspending license). Further, like in this case, Parrish's prior misconduct generally relates to improper handling of fees and trust account violations, an aggravating factor. *Baldwin*, 857 N.W.2d at 215.

Parrish has practiced law for seventeen years. He is not a new practitioner unfamiliar with our ethical rules. His substantial experience in the practice of law is another aggravating factor in imposing discipline. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 758 N.W.2d 227, 231 (Iowa 2008).

The case also involves multiple rule violations. Multiple rule violations are an aggravating factor giving rise to more serious sanctions. *Baldwin*, 857 N.W.2d at 213; *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Johnson*, 792 N.W.2d 674, 682 (Iowa 2010).

In addition, Parrish's failure to forward the transcript fee to the court reporter was a knowing violation of rule 32:1.15(d). He understood the check was for the purpose of paying for the transcript and not for satisfying his fees. This was not a situation in which he thought that he had earned the funds, *cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Piazza*, 756 N.W.2d 690, 697–98 (Iowa 2008), or in which he had sloppy or lazy bookkeeping, *cf. Apland*, 577 N.W.2d at 60. Knowingly violating our ethical rules is an aggravating circumstance. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lubinus*, 869 N.W.2d 546, 553 (Iowa 2015).

Parrish's course of conduct during the disciplinary proceedings is also an aggravating factor. Parrish repeatedly engaged in conduct that made the commission's work more difficult, *e.g.*, he failed to timely respond and cooperate in the discovery process, he arrived late for a hearing, he failed to provide hard copies of premarked exhibits, he issued last minute subpoenas without proof of service, and he failed to file a brief with the commission. He also did not file a posttrial brief before the commission. Failure to cooperate with the commission in the hearing process is an aggravating factor. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Honken*, 688 N.W.2d 812, 821 (Iowa 2004). Further, his attempt to concoct a "General 'Flat Fee' Retainer" agreement to avoid our trust regulations suggest a deliberate effort to evade, rather than comply, with our ethical rules.

Parrish's misconduct also caused harm to his client. He did not promptly forward the funds received for the transcript to the court reporter. As a result, no transcript was prepared, and Ware's appeal of a child custody modification matter was dismissed. Causing such harm to a client through ethical misconduct is simply unacceptable and is an aggravating factor in this case. *See McCann*, 712 N.W.2d at 97. The fact that Parrish's action deprived his client of her right to appeal a highly personal and sensitive matter involving custody of her child imposes serious intangible harm on the client, is an embarrassment to the legal profession, and undermines citizen confidence in our legal system.

Finally, Parrish simply refused to take responsibility for his actions. Refusing to admit wrongful conduct and showing no remorse is an aggravating factor. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Tofflemire*, 689 N.W.2d 83, 93 (Iowa 2004). Parrish's lack of remorse contrasts with his earlier suspension, where he took full responsibility and

implemented or planned to implement improvements in his billing and accounting practices. *See Parrish*, 801 N.W.2d at 589. His current lack of remorse is a powerful aggravating factor in this case because a major role of our disciplinary system is to protect the public from overreaching and unethical lawyers.

In sum, the lengthy nature of Parrish's disciplinary record; the multiple nature of his violations and the relationship of the violations to past misconduct; his experience as an attorney; his resistance to the processes before the commission; his knowledge of his own wrongdoing, coupled with his refusal to admit wrongdoing or show remorse are important aggravating factors in imposing discipline.

3. *Sanction.* It is abundantly clear that in light of the nature of the violations and the many aggravating factors, a lengthy suspension is appropriate in this case. Although the facts vary from case to case, we have imposed lengthy suspensions for aggravated attorney misconduct. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCarthy*, 814 N.W.2d 596, 611 (Iowa 2012) (imposing two year suspension and noting "a troubling pattern of neglect, a blatant disregard for his clients, and a lack of respect for the disciplinary process"); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Plumb*, 766 N.W.2d 626, 634–35 (Iowa 2009) (imposing eighteen-month suspension for misconduct including trust account violations, failure to return unearned fees, and deceit to cover neglect); *Honken*, 688 N.W.2d at 820, 822 (imposing two-year suspension for misconduct including multiple acts of misrepresentation to the court, neglect of client matters, misrepresenting the status of matters to clients, and failing to respond to the board's inquiries). More than anything, Parrish's obvious indifferent attitude toward our disciplinary system and basic professional norms and his persistent history of disciplinary problems weigh heavily in the

sanctions scale. Based on our review of the record, we suspend Parrish from the practice of law indefinitely with no possibility of reinstatement for two years from the date of this opinion.

## IV. Conclusion.

For the above reasons, Eric Parrish's license to practice law is suspended for two years. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 34.23(3). Parrish must also comply with the requirement of Iowa Court Rule 34.24 with respect to the notification of clients and opposing counsel. To establish eligibility for reinstatement, Parrish must file an application for reinstatement meeting all the applicable requirements of Iowa Court Rule 34.25. Parrish further must show that he has refunded to Ware the sum of $2467.50 prior to reinstatement. We tax costs of this action to Parrish pursuant to Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**

All justices concur except Wiggins, J., who dissents, and McDonald, J., who takes no part.

#18–0319, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*

**WIGGINS, Justice (dissenting).**

I dissent. I would revoke Eric Parrish's license to practice law for two reasons. First, he misappropriated money a client gave him for a transcript. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*, 830 N.W.2d 355, 360–64 (Iowa 2013) (Wiggins, J., dissenting). The majority appears to rely on *Iowa Supreme Court Attorney Disciplinary Board v. Morse*, 887 N.W.2d 131 (Iowa 2016), when it determines revocation is not appropriate. *Morse*, however, is distinguishable. In *Morse*, the board did not allege theft or misappropriation under rules 32:8.4(b) and (c). *See id.* at 138 (listing the allegations filed by the board against Morse). Had the board alleged misappropriation, I am not so sure we would have only suspended Morse's license.

Second, and more importantly, his conduct in this and prior matters leads me to conclude he is not fit to practice law. As the majority notes in its opinion, Parrish has a history of prior violations that have led this court to admonish him in ten instances, reprimand him twice, and suspend his license once. Moreover, his prior violations have generally related to improper handling of fees and trust account violations. In this proceeding, he attempted to thwart the disciplinary process and failed to take responsibility for his actions. After seventeen years, one would think that he would understand the ethical responsibilities and duties of a lawyer.

Therefore, based on the seriousness of his present violations, his past violations, and his failure to understand his ethical responsibilities and duties, he is not fit to practice law. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman*, 674 N.W.2d 129, 139 (Iowa 2004) (revoking an attorney's license to protect the public and the reputation of the bar

after finding an attorney not fit to practice law due to the seriousness and repetitive nature of the lawyer's ethical violations).

A revocation would allow him the opportunity to reapply for his license after at least five years under our recently amended Iowa Court Rule 34.25(7)–(9). However, I would not allow his reinstatement without him retaking and passing the Multistate Professional Responsibility Examination.