# IN THE SUPREME COURT OF IOWA

No. 20–0797

Submitted September 17, 2020—Filed January 8, 2021

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**MICHAEL H. SAID,**

Respondent.

_____

On review of the report of the Iowa Supreme Court Grievance Commission.

The Iowa Supreme Court Attorney Disciplinary Board charged an attorney with multiple violations of the Iowa Rules of Professional Conduct, including violations related to competence, diligence, promptness, client disclosures and communication, conflict of interest, and charging unreasonable fees, the grievance commission recommended public reprimand. **LICENSE SUSPENDED.**

Appel, J., delivered the opinion of the court, in which all participating justices joined. McDermott, J., took no part in the consideration or the decision of the case.

Tara van Brederode and Crystal W. Rink, Des Moines, for complainant.

Leon Spies of Spies & Pavelich, Iowa City, for respondent.

**APPEL, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board (Board) filed a complaint against attorney Michael Said alleging twenty-six violations of the Iowa Rules of Professional Conduct arising out of representation of four clients in immigration matters. After a hearing, the Iowa Supreme Court Grievance Commission (commission) found that Said violated a number of disciplinary rules that require an attorney keep his client adequately informed about the representation. The commission further found that Said revealed client information without the client's consent. The commission held that the remainder of the charges were not supported by a convincing preponderance of the evidence. As a result, the commission recommended that we publically reprimand Said.

Based on our de novo review of the record, we suspend the license of Said for thirty days.

## I. Factual and Procedural Background.

**A. Introduction.** Michael Said is an Iowa attorney admitted to the bar in 1994. His practice focuses on immigration law. Said formed his own law firm in 1999. He has engaged in pro bono representation over the years, and in 2006, he received an award for pro bono work from the Polk County Volunteer Lawyers Project.

Said has a disciplinary history. In 2015, we imposed a thirty-day suspension on Said. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Said*, 869 N.W.2d 185, 195 (Iowa 2015). We concluded that Said violated our disciplinary rules related to keeping his client reasonably informed by failing to advise a client of the existence of a removal order and that the time to appeal had passed because the attorney had missed a deadline. *Id.* at 190–91; *see also* Iowa R. Prof'l Conduct 32:1.4(a)(3), (b). We also found that Said made a false statement to a tribunal and violated rules

relating to fees and trust accounts. *Said*, 869 N.W.2d at 191–93 (finding violations of Iowa Rules of Professional Conduct 32:3.3(a)(1), 32:1.15(c), and 32:1.15(f)).

Said also received a public reprimand on June 25, 2015. The Board found that Said withdrew a flat fee from his trust account before it had been fully earned in violation of Iowa Rule of Professional Conduct 32:1.5(c). The Board also found language in a fee agreement utilized by Said that provided for a flat fee if the matter was "uncontested" and additional fees if it became contested was misleading in the context of immigration and postconviction-relief cases. These cases, the Board reasoned, are almost universally contested. The Board concluded that no further discipline was required because Said had received a private admonition and the fee agreement in question predated that prior admonition.

In addition, Said has received five private admonitions over the years from the Board. He was admonished on September 18, 2003, for failure to provide his clients with itemized billings; on June 22, 2007, for engaging in dual representation of a husband and wife in an immigration matter after conflicts of interest arose; on January 10, 2011, for advising and assisting immigration clients in filing frivolous waiver applications; on June 29, 2011, for lack of diligence in protecting a client's interest where Said failed to inform a client that the client's physical presence was necessary at a telephonic hearing and for conduct prejudicial to the administration of justice; and on December 23, 2013, for charging an unreasonable fee and using a misleading fee agreement.

The allegations in this proceeding arise from Said's representation of four immigration law clients. All have been unlawfully present in the United States for over ten years. Mauricio Ramirez Fernandez and

Guillermo Hernandez Ruiz were subject to removal proceedings but hired Said to represent them in cancellation of removal proceedings.

Irma Luna Carrillo and Susan Alba Araniega were also unlawfully present in the United States for over ten years. They hired Said to assist in the preparation of what is known as a U visa application. A U visa application is available to unlawfully present persons who assist law enforcement in the prosecution of certain crimes.

This matter involves a broad array of attorney disciplinary issues in an immigration law setting. Based on our de novo review of the record, we find the following facts in connection with Said's representation.

**B. Mauricio Ramirez Fernandez.**

1. *Factual background.* Originally from Mexico City, Mexico, Ramirez Fernandez has resided in the United States for twenty-two years without lawful status. He was married to Luna Carrillo, another client of Said, who also filed a complaint with the Board regarding Said's representation of her.

In January 2011, immigration officers arrested Ramirez Fernandez at his place of work as unlawfully residing in the United States. The United States Department of Homeland Security (DHS) thereafter brought removal proceedings against him.

Ramirez Fernandez hired Said to seek cancellation of removal. On February 23, he signed a fee agreement with Said. The fee agreement provided that the "[c]lient shall pay a fee of $6000.00 if uncontested." If the matter became contested, the fee agreement provided that Ramirez Fernandez was required to pay Said $250 per hour for additional work. Pursuant to the fee agreement, Said filed documents with immigration authorities, on Ramirez Fernandez's behalf, seeking cancellation of removal.

In the summer of 2011, Ramirez Fernandez advised Said that he desired to obtain a driver's license but had titled a vehicle in the past using a false Social Security number. Said encouraged him to go to the Iowa Department of Transportation (DOT) to apply for a driver's license. For an additional fee of $500, Said agreed to accompany him to the DOT.

Prior to the meeting at the DOT, Said informed Donald Sharr, an investigator for the DOT, that he had a client who used a false Social Security number to register his car and house trailer. Said provided Sharr with the false Social Security number used by Ramirez Fernandez in the past and asked Sharr, "Let me know what you want to do" in regard to bringing Ramirez Fernandez to the DOT to be interviewed.

Said and Ramirez Fernandez appeared at the DOT. At the meeting, Ramirez Fernandez signed a "Voluntary Statement" that stated, "I used a made up Social Security number to register a car in Polk County Iowa on 10/27/08." Sharr issued Ramirez Fernandez a citation charging him with fraudulent practice in the third degree in violation of Iowa Code section 714.11(3) (2011).

The state filed a preliminary complaint against Ramirez Fernandez in Polk County District Court. Ramirez Fernandez hired Said to represent him in the criminal matter. The fee agreement provided for a payment of a flat fee if the matter was "uncontested." If the matter became contested, the fee agreement provided that Said would be compensated for additional work at a rate of $250 per hour.

The preliminary complaint listed Michael Said as a witness. Said filed an appearance in the matter on July 28. A subsequent trial information filed on August 24 charged Ramirez Fernandez with fraudulent applications in the third degree and listed Said as a witness. An amended trial information later changed the charge to fraudulent

practice in the fourth degree, a serious misdemeanor under Iowa law. Iowa Code § 714.12. The state's amended trial information also listed Said as a witness.

In response to the charge of fraudulent practice in the fourth degree, Ramirez Fernandez, acting on the advice of Said, agreed on October 7 to plead guilty. He signed a guilty plea and sentencing order stating, "I went and registered a car using a SS# which was not mine."

At a hearing on the plea agreement, an interpreter translated the district court's colloquy into Spanish for Ramirez Fernandez. Among other things, the district court admonished Ramirez Fernandez that "if you are not a citizen of this country there could be negative immigration consequences as a result of your plea of guilt." When asked if he understood whether there could be negative immigration consequences and whether Mr. Said had explained that to him, Ramirez Fernandez responded "yes."

Pursuant to the plea agreement, the district court sentenced Ramirez Fernandez to 180 days in jail but suspended the jail time. In addition, the district court placed Ramirez Fernandez on probation for one year, required him to provide fifty hours of community service, and required him to enroll in a Latino Orientation Program.

2. *Immigration proceedings after conviction.* On August 25, 2015, an immigration judge granted the government's motion to pretermit cancellation proceedings. A motion to pretermit cancellation of removal in immigration law is the equivalent of a motion for summary judgment against the party seeking cancellation. The immigration judge found that although Ramirez Fernandez was convicted under a divisible statute with multiple avenues to support a conviction, the factual basis in his guilty plea was the declaration of Ramirez Fernandez that "I went and registered

a car using a SS# which was not mine." As a result, his conviction involved fraud. Fraud, according to the immigration judge, was a crime involving moral turpitude, and as a result, Ramirez Fernandez was disqualified from seeking cancellation of removal.

In addition, the immigration judge found that fraudulent practice in the fourth degree was not a "petty offense," which removed his offense from meeting the petty offense exception to crimes involving moral turpitude. The immigration judge noted that the maximum penalty for the offense was "one year or less" rather than the "less than one year" required for a petty offense. Because of these rulings, the immigration judge concluded that Ramirez Fernandez was, as a matter of law on the undisputed facts, not entitled to cancellation of removal.

3. *Application for postconviction relief.* On October 10, 2014, new counsel for Ramirez Fernandez filed an application for postconviction relief in connection with his guilty plea to fraudulent practice in the fourth degree. In his postconviction-relief action, Ramirez Fernandez alleged that he received ineffective assistance of counsel because: (1) Said failed to warn him prior to seeking a driver's license from the DOT that if he sought a license, the DOT could uncover his false use of a Social Security number just prior to the expiration of the statute of limitations for the offense, (2) Said failed to warn him before accepting the plea that his criminal conviction and sentence would render him deportable or ineligible for immigration relief in his pending removal action, (3) Said failed to provide an interpreter when Ramirez Fernandez signed the plea agreement, (4) Said failed to disclose or secure a waiver for a conflict of interests that arose when the state listed Said as a prosecution witness in the criminal proceeding, and (5) Said failed to file a motion to suppress evidence

received by the DOT from information that was supplied by Said in violation of attorney–client privilege.

On January 4, 2017, the district court ruled that Said provided ineffective assistance of counsel at the plea-bargaining stage of the criminal proceeding. According to the district court, Said was fully aware of the negative consequences of the plea bargain, namely, that DHS would regard a conviction of fraudulent practice in the fourth degree as conviction of a crime involving moral turpitude and result in a denial of Ramirez Fernandez's application for cancellation of removal. Yet, the district court found that Ramirez Fernandez failed to show prejudice. As a result, the district court denied the application for postconviction relief.

On appeal, the court of appeals reversed and remanded the case to the district court. *Fernandez v. State*, No. 17–0132, 2018 WL 3471591, *11 (Iowa Ct. App. July 8, 2018). The court of appeals found that Said had a concurrent conflict of interest as he was named as a witness by the state in the proceeding. *Id.* at *7–9. Because of his failure to advise Ramirez Fernandez of the conflict and its potential consequences, the court of appeals ruled that his criminal conviction of fraudulent practice in the fourth degree should be reversed. *Id.* at *11. In addition, the court of appeals found that Said failed in an essential duty when he failed to adequately advise Ramirez Fernandez of the negative consequences of his plea on his immigration status. *Id.* at *9–11.

On the issue of prejudice, the court of appeals concluded that if Ramirez Fernandez had been properly advised, he could have "rationally decided to hold the State to its burden of proof" since he had nothing to lose by doing so. *Id.* at *11. As a result, the court of appeals reversed the conclusion of the district court that Ramirez Fernandez had failed to show prejudice. *Id.*

After obtaining relief from his original conviction, Ramirez Fernandez was able to enter into a new plea agreement with the state. On November 28, 2018, he entered a plea of guilty to fraudulent practice in the *fifth degree*, which was accepted by the district court on December 4. The reduction of the offense from fraudulent practice in the fourth degree to fraudulent practice in the fifth degree had significant consequence for Ramirez Fernandez, as the latter crime is a petty offense under immigration law. As a result, Ramirez Fernandez's application for cancellation was no longer subject to dismissal because of a conviction of a crime involving moral turpitude.

4. *Allegations by the Board.* The Board brought seven charges against Said in connection with his representation of Ramirez Fernandez. The Board alleged: (1) Said failed to provide competent representation under Iowa Rule of Professional Conduct 32:1.1; (2) Said failed to obtain informed consent from his client under Iowa Rule of Professional Conduct 32:1.4(a)(1); (3) Said failed to reasonably consult with his client about the means by which the client's objectives are to be accomplished under Iowa Rule of Professional Conduct 32:1.4(a)(2); (4) Said failed to consult with his client about any relevant limitations on the lawyer's conduct under Iowa Rule of Professional Conduct 32:1.4(a)(5); (5) Said charged an unreasonable fee under Iowa Rule of Professional Conduct 32:1.5(a); (6) Said revealed information relating to the representation of a client without the client's consent under Iowa Rule of Professional Conduct 32:1.6(a); and (7) Said represented a client with an impermissible concurrent conflict of interest under Iowa Rule of Professional Conduct 32:1.7(a)(2).

5. *Testimony at the disciplinary hearing.* The commission heard testimony from a number of witnesses, including Ramirez Fernandez and

Said. In addition, the commission heard testimony from two expert witnesses with experience in immigration law.

The Board presented the testimony of Drake law professor Suzan Pritchett. In addition to teaching immigration law at Drake, Pritchett directed a legal clinic during her previous employment at the University of Wyoming that was specifically dedicated to immigration and international human rights.

According to Pritchett, Ramirez Fernandez met the basic criteria for cancellation of removal. In her view, however, pleading guilty to fraudulent practice in the fourth degree was problematic. According to Pritchett, courts have found that fraudulent practice type crimes are "a categorical match" for a crime involving moral turpitude. If an applicant for cancellation of removal is convicted of a crime involving moral turpitude, the applicant is not eligible for cancellation of removal. According to Pritchett, escaping the adverse consequence of pleading guilty to the crime of fraudulent practice in the fourth degree would impose on him a "very, very difficult, if not impossible burden."

Pritchett also testified regarding the need for admonitions to the client. According to Pritchett, a general admonition about risks in immigration law was not sufficient. Pritchett testified that her admonition would state that

> it would be very dangerous to affirmatively present yourself to law enforcement and put yourself at risk of receiving a criminal conviction which, . . . if it doesn't statutorily disqualify you for cancellation of removal, it certainly can be considered negatively as a matter of discretion.

Said offered the testimony of immigration lawyer Peter Williamson. Williamson practiced immigration law in Texas and across the country for

fifty years. He was a past president of the American Immigration Lawyers Association and had handled more than fifty cancellation of removal cases.

According to Williamson, the use of a false Social Security number to register a vehicle was a problem no matter how it was treated by Said. In colloquial terms, Williamson stated that Ramirez Fernandez had "baggage" and that Said tried to "clean him up" prior to any removal hearing. With respect to disqualification from cancellation of removal for committing a crime involving moral turpitude, Williamson testified that the law is always changing in immigration. As for any admonition, Williamson believed that the client had essentially put himself in his lawyer's hands and that any detailed admonition was not required.

6. *Findings and recommendation of the commission.* The commission concluded that Said was attempting to help Ramirez Fernandez in light of his past unlawful decisions. It did not explore the contours of immigration law. Instead, the commission found that Said did not adequately communicate the potential risks of his strategy with Ramirez Fernandez, namely, that he could be charged with a crime and that such charges could adversely affect his immigration status. Instead, the commission found that Said exercised his own judgment that the "coming clean" strategy was the best route available for his client without allowing the client to make an informed decision.

As a result, the commission found that Said failed to obtain informed consent in violation of Iowa Rule of Professional Conduct 32:1:4(a). Although there may be some ambiguity, the commission also appears to have found a violation of the related provision in Iowa Rule of Professional Conduct 32:1.4(b), which requires an attorney to communicate with a client to the extent necessary to allow the client to make informed decisions. Further, the commission found that by giving information to

investigator Sharr without the consent of Ramirez Fernandez, Said revealed information about a client in violation of Iowa Rule of Professional Conduct 32:1:6(a). The commission, however, generally declared without specific findings that all other charges brought by the Board were not supported by a clear preponderance of the evidence.

### C. Irma Luna Carrillo.

1. *Factual background.* Luna Carrillo lived in the United States illegally for over two decades. She was referred to Said by her husband, Ramirez Fernandez. Luna Carrillo told Said that she found stolen jewelry in a rental home in which she lived with her family. A criminal prosecution was commenced against the offender. According to Luna Carrillo, she then received several mysterious phone calls that she regarded as threatening. Under the circumstances, Said advised Luna Carrillo that she would be eligible for a U visa.

Luna Carrillo hired Said to attempt to obtain the U visa. She signed a fee contract with Said on November 25, 2013. Under the fee agreement, Luna Carrillo agreed to "pay a fee of $8,000, if uncontested." If the matter became contested, she agreed to pay Said at the rate of $250 per hour "for all additional work" performed on the matter. Ultimately, she paid Said a total of $7000 pursuant to the fee agreement. Among other things, Said advised Luna Carrillo to obtain counseling to help provide a factual basis for a claim of emotional harm necessary to support a U visa application.

An itemized statement on the file prepared by Said's office shows that work was done on the file each month during the period from December 2013 to June 2014, mostly by Said but also by two other lawyers in the office. The amount of work reflected in the itemized statement totaled $2655. Luna Carrillo became dissatisfied with progress on the matter, however, and requested a refund of a retainer she had paid. After

she fired Said, Luna Carrillo received a refund of $4345. This figure represented the total amount she had paid to Said minus the progress billings indicated on Said's itemized statement developed over the course of the representation.

2. *Allegations of the Board.* The Board filed four charges in connection with Said's representation of Luna Carrillo. Specifically, the Board alleged: (1) Said failed to provide competent legal advice under Iowa Rule of Professional Conduct 32:1.1; (2) Said charged an unreasonable fee under Iowa Rule of Professional Conduct 32:1.5(a); (3) Said failed to properly deliver to client funds the client is entitled to receive under Iowa Rule of Professional Conduct 32:1.15(d); and (4) Said failed to keep separate property in which two or more persons claimed an interest under Iowa Rule of Professional Conduct 32:1.15(e). The Board, however, voluntarily dismissed the last two allegations.

3. *Testimony at the disciplinary hearing.* At the disciplinary hearing, Said and Luna Carrillo basically told their side of the story. Said defended his work, while Luna Carrillo claimed that another attorney had advised her that she did not qualify for a U visa and, as a result, she would be wasting her money. In addition, the commission heard the testimony of two expert witnesses.

The Board offered the testimony of Pritchett. Pritchett canvassed the requirements of the U visa program. According to Pritchett, the receipt of mysterious phone calls was not enough to establish a qualifying crime. Pritchett conceded that Luna Carrillo might be eligible if she had been the victim of witness tampering, but even so, she would still have to show substantial emotional harm necessary to qualify for a U visa. Further, according to Pritchett, under the facts as she understood them, it would be very hard to come up with the necessary law enforcement certification.

Said offered testimony from his expert Williamson. Williamson testified that attempted crimes would be sufficient to trigger potential U visa protection. He viewed the phone calls as an attempt to intimidate Luna Carrillo. Williamson did not view the application as frivolous, but he characterized it as "very clever."

4. *Findings and conclusions of the commission.* The commission held that the Board failed to prove the allegations by a convincing preponderance of the evidence. The commission reasoned that the strategy of seeking to obtain a U visa most likely had a very slim chance of success. Yet, according to the commission, it may have had some secondary benefits, such as buying Luna Carrillo more time to remain in the United States notwithstanding her unlawful status.

On the fee issue, the commission recognized that another attorney had advised Luna Carrillo differently on her eligibility for a U visa. The commission did not find the contrary advice sufficient to support a finding that the fee charged by Said was unreasonable in this case.

**D. Guillermo Hernandez Ruiz.**

1. *Factual background.* Hernandez Ruiz lived in the United States without lawful immigration status since 1999. Police arrested Hernandez Ruiz while he was paying a parking ticket. On November 3, 2010, DHS initiated removal proceedings against him. Hernandez Ruiz hired Said to represent him in the immigration matter. On February 28, 2011, Said filed an application for cancellation of removal on behalf of Hernandez Ruiz.

In early March 2012, Said and Hernandez Ruiz discussed how he might obtain a driver's license. In the discussion, Hernandez Ruiz did not disclose that he had used a false Social Security number to register a vehicle in the past.

Hernandez Ruiz appeared at a DOT office on March 6, unaccompanied by Said. DOT staff informed him that his name was linked to two Social Security numbers. Hernandez Ruiz told the DOT that he had used a false Social Security number. The DOT staff declined to issue him a driver's license at that time.

Hernandez Ruiz then consulted with Said about his situation. After the consultation, Said sent an e-mail to investigator Sharr indicating that Hernandez Ruiz had visited DOT and "believes that he registered a car in 2011 using a SS number not belonging to him." Said asked Sharr to "check and if need be give me some dates so that we may come in?" Said, Hernandez Ruiz, translator Melissa Waalk, and Sharr met on March 9, 2012. At the meeting, Hernandez Ruiz signed a "Voluntary Statement" stating, "I registered 5 cars using an invalid Social Security . . . between 2009 & 2010." Sharr issued him a citation for fraudulent practice in the third degree as a result of his registering a vehicle using a false Social Security number. Said charged Hernandez Ruiz a flat fee of $500 to accompany him to the DOT meeting.

On April 25, the state filed a trial information in Polk County District Court charging Hernandez Ruiz with fraudulent practice in the third degree. The state's witness list included Said and translator Waalk. At first, a public defender was appointed to represent Hernandez Ruiz. But on May 31, Hernandez Ruiz signed a fee contract with Said to represent him in the criminal matter. Under the fee contract, Hernandez Ruiz agreed to pay $2000 "for a dismissal or plea of the charges." If the matter was contested and went to trial, Hernandez Ruiz agreed to pay Said an additional retainer. On June 1, the public defender withdrew and Said made his appearance, met with his client, arrived at a plea bargain with the prosecutor, and filed a guilty plea and order with the district court.

Hernandez Ruiz pleaded guilty to fraudulent practice in the fourth degree. In the guilty plea and order, Hernandez Ruiz stated, "I used a Social Security Card that I bought to register a car." Like Ramirez Fernandez, the district court sentenced Hernandez Ruiz to 180 days in the Polk County Jail with the jail time suspended. The district court further placed him on probation for one year, required him to perform fifty hours of community service, and required him to attend a Latino Orientation Program.

2. *Impact of guilty plea on immigration proceedings.* DHS commenced removal proceedings against Hernandez Ruiz on November 3, 2010. On February 28, 2011, Said filed on behalf of Hernandez Ruiz an application for cancellation of removal. On September 6, 2013, DHS filed a motion to pretermit Hernandez Ruiz's application for cancellation, asserting that he had been convicted of a crime involving moral turpitude when he pleaded guilty to fraudulent practice in the fourth degree and was therefore ineligible for cancellation of removal. Hernandez Ruiz did not respond to the government's motion.

An immigration judge granted the motion to pretermit. The immigration judge canvassed caselaw, concluding that while the Iowa fraudulent practice statute was divisible and thus could require examination to determine which section supported the conviction, Hernandez Ruiz had admitted, "I used a social security number that I bought to register a car." According to the immigration judge, such conduct amounted to a crime involving moral turpitude. As in the case involving Ramirez Fernandez, the immigration judge also rejected the petty offense exception, noting that the relevant penalty for fraudulent practice in the fourth degree carried a sentence of "one year or less," which was not "less than one year."

Upon receiving the immigration ruling, Hernandez Ruiz met with Moses Mangae, a lawyer in Said's office. At the meeting, Hernandez Ruiz indicated that he feared returning to Mexico because he would be subject to extortion and physical harm from gangs. They decided to request permission to file for relief under an asylum theory. On January 17, 2014, the immigration judge denied the government's motion to deem the application for relief abandoned.

3. *Application for postconviction relief.* On May 29, 2015, Hernandez Ruiz filed an application for postconviction relief seeking to overturn the conviction arising from his guilty plea. Hernandez Ruiz claimed that at the time he pled guilty, Said failed to warn him that the conviction and sentence as proposed would render him deportable or ineligible for immigration relief in his pending proceedings.

The district court denied Hernandez Ruiz's petition for postconviction relief. The district court first addressed whether Said adequately advised Hernandez Ruiz prior to pleading guilty. Citing *Padilla v. Kentucky*, 559 U.S. 356, 369, 139 S. Ct. 1473, 1483 (2010), the district court stated that when the law is unclear about the potential risks of a criminal conviction, counsel can satisfy his duty to his client by warning that "pending criminal charges may carry a risk of adverse immigration consequences."

The district court emphasized that the question of whether a particular state charge amounted to a crime involving moral turpitude, thereby risking disqualification law of seeking cancellation of removal, was "a notoriously murky area." According to the district court, Said complied with his duty under *Padilla* by telling Hernandez Ruiz prior to pleading guilty that the charge could result in his deportation. In addition, the district court noted that Hernandez Ruiz signed a plea bargain and

sentencing order acknowledging his view of the statement that informed him that a criminal conviction "may result in deportation or other adverse immigration consequences."

The district court then turned to what it characterized as the tougher question, namely, whether Said violated his duty to provide effective assistance when he failed to advise Hernandez Ruiz prior to going to the DOT of the option to simply avoid driving. The district court found that Said did not advise Hernandez Ruiz that if he sought a driver's license from the DOT, he risked being charged with a crime that could adversely impact his immigration status. The district court observed that Hernandez Ruiz had testified that prior to consulting with Said regarding obtaining a driving license, he was getting rides to work.

The district court found that Said breached his duty to Hernandez Ruiz by failing to inform him that he did not need to obtain a driver's license and that he could be charged with a crime if he pursued the driver's license matter that would adversely affect his immigration status. The district court further found that Hernandez Ruiz was prejudiced by the failure of counsel to properly advise him prior to seeking a driver's license from the DOT.

The district court next considered whether Said was ineffective when he failed to inform Hernandez Ruiz that he was listed as a witness in the prosecution's trial information. While Said should have advised Hernandez Ruiz about the potential conflict and the information necessary to obtain informed consent, the district court concluded that Said probably would not have been called as a witness in the matter. The district court reasoned that that Hernandez Ruiz received the best plea agreement to the pending charge that the state was providing at the time. The district court noted that there was no evidence that another, nonconflicted lawyer could

receive a better offer. As a result, the district court found no prejudice arising from the potential conflict.

Nonetheless, because Said provided ineffective assistance prior to Hernandez Ruiz attempting to receive his driver's license, the district court granted the motion for postconviction relief.

The state appealed. We retained the case. *See Ruiz v. State*, 912 N.W.2d 435 (Iowa 2018). We held that the district court erred in determining that the right to counsel attached when Hernandez Ruiz consulted Said prior to seeking a driver's license from the DOT. *Id.* at 439–41. At that time, no investigation regarding his false use of a Social Security number was pending. *Id.* Because the right to counsel did not attach at that time under either the Sixth Amendment or the Iowa Constitution, we reversed the trial court's order granting Hernandez Ruiz postconviction relief. *Id.* at 443.

4. *Allegations by the Board.* The Board brought eight charges against Said in connection with his representation of Hernandez Ruiz. The Board alleged: (1) Said failed to provide competent representation under Iowa Rule of Professional Conduct 32:1.1; (2) Said failed to promptly inform the client of any decision or circumstance to which the client's informed consent was required under Iowa Rule of Professional Conduct 32:1.4(a)(1); (3) Said failed to reasonably consult with his client about the means by which the client's objectives are to be accomplished under Iowa Rule of Professional Conduct 32:1.4(a)(2); (4) Said failed to consult with the client about a relevant limitation on the lawyers conduct under Iowa Rule of Professional Conduct 32:1.4(5); (5) Said failed to explain a matter to the extent reasonably necessary to permit the client to make informed decisions under Iowa Rule of Professional Conduct 42:1.4(b); (6) Said revealed information about a client without informed consent under Iowa

Rule of Professional Conduct 32:1.6(a); and (7) Said represented a client with an impermissible concurrent conflict of interest under Iowa Rule of Professional Conduct 32:1.7(a)(2).

5. *Testimony before the commission.* Both Hernandez Ruiz and Said testified before the commission. The parties offered the same expert testimony in support of their position on Hernandez Ruiz as was offered in support of Ramirez Fernandez.

6. *Findings and conclusions of the commission.* The commission found that the Board failed to prove any of the allegations by a convincing preponderance of the evidence.

The commission contrasted the case of Hernandez Ruiz with that of Ramirez Fernandez. According to the commission, Hernandez Ruiz did not tell Said that he had previously used a false Social Security number when he consulted with Said prior to going to the DOT to attempt to get a driver's license. The commission further found that the Board did not prove that Said did not fully advise Hernandez Ruiz of the potential impact on his immigration status of his voluntary statement to the DOT when Hernandez Ruiz and Said made the second visit to the DOT.

**E. Representation of Susan Alba Araniega.**

1. *Factual background.* Although listed by the Board as a witness, Susan Alba Araniega did not appear at the disciplinary hearing. The record shows, however, that Alba Araniega consulted Said in February 2015 regarding the possibility of applying for a U visa in light of her experience of domestic abuse. Alba Araniega retained Said to represent her on March 14. On May 1, Said obtained the signature of a district court judge on the law enforcement certification Form I-918 Supplement B. In support of her claim and at Said's request, Alba Araniega prepared a handwritten thirty-six-page Spanish summary of her case in August.

Said was suspended from practice from September 4 to October 4. During the period of suspension, Mangae wrote a letter, dated October 2, to Alba Araniega that requested eight categories of additional documents. According to the itemized billing statement, attorneys and others in Said's office sent her a questionnaire, requested documents, and otherwise worked on her file in October and November. Because the application for the U visa had not been filed within six months of the law enforcement certification, however, another new certification was required to support the application.

Dissatisfied with progress, Alba Araniega obtained other counsel. Lawyers in Said's law office sent her files to the new counsel in a reasonable period of time. Other counsel was able to secure a new law enforcement certification for Alba Araniega and complete the application.

The fee agreement signed by Alba Araniega and Said provided that the client would pay a fee of $4000 for the representation. The fee agreement did not contain the misleading language used in Said's prior fee agreements. After his discharge, Said refunded to Alba Araniega $1177.33 in unearned fees.

2. *Allegations of the Board.* The Board alleged six violations of our disciplinary rules in connection with Said's representation of Alba Araniega. The Board alleged: (1) Said failed to provide competent representation under Iowa Rule of Professional Conduct 32:1.1; (2) Said failed to act with reasonable diligence and promptness under Iowa Rule of Professional Conduct 32:1.3(b); (3) Said failed to reasonably consult with his client about the means by which the client's objectives are to be accomplished under Iowa Rule of Professional Conduct 32:1.4(a)(2); (4) Said failed to explain a matter to the extent reasonably necessary to allow the client to make informed decisions under Iowa Rule of

Professional Conduct 32:1.4(b); (5) Said charged an unreasonable fee under Iowa Rule of Professional Conduct 32:1.5(a); and (6) Said failed to promptly deliver to the client funds to which the client is entitled under Iowa Rule of Professional Conduct 32:1.15(d). The Board voluntarily dismissed the consultation claim and the failure to make an informed decision claim.

3. *Testimony before the commission.* Said testified before the commission. He generally asserted that he and his staff were appropriately preparing the file and that delays were as much a fault of the client as his office. Alba Araniega did not testify before in the proceedings.

The Board offered testimony from Pritchett on the Alba Araniega matter. According to Pritchett, a law enforcement certification was a central component of a U visa application. She testified that there might be all kinds of intervening circumstances that would prevent a potential U visa applicant from obtaining a new certificate after a previous certificate expires. She believed Said should have filed a U visa application prior to the expiration of the law enforcement certificate even if it was incomplete. According to Pritchett, a party could supplement a U visa application at a later date.

Williamson testified on behalf of Said. He noted that the instruction on the U visa form declares that "if you submit an incomplete case, we . . . have the power to deny it because it's incomplete." In contrast to Pritchett, Williamson testified that the chance of getting a file supplemented in the immigration bureaucracy was "zero percent."

4. *Findings and conclusions of the commission.* The commission found that the Board failed to prove the charges by a convincing preponderance of the evidence. The commission noted that there was nothing improper about having other attorneys in the same law office work

on a file. The commission further noted that successor counsel was able to secure a new law enforcement certification for Susan Alba Araniega and proceed with the case. As a result, nothing Said did resulted in prejudice to the client.

**F. Recommendation of Commission.** In considering its sanctions recommendation, the commission found aggravating factors. The commission found Said's prior discipline an aggravating factor. *See Said*, 869 N.W.2d 185. The commission also cited Said for having a glib attitude toward his former clients and this proceeding.

On the other hand, the commission also found mitigating factors. The commission noted that Said's career involved representing undocumented immigrants at high legal risk. Further, Said had changed his law office management practice to avoid the circumstances that gave rise to some of the disputed facts in the case. Said had improved his documenting advice to immigrants to improve transparency and avoid later claims of miscommunication or confusion.

In conclusion, the commission noted the difficulty of representing undocumented immigrants. The commission observed,

> Not all lawyers have the same tolerance for helping those living in the shadows and not all lawyers have the gumption to bring legally risky cases or make novel arguments. . . . Clients often benefit from (and often willingly pay for) those risks.

The commission recognized that immigration lawyers may take risks that do not ultimately succeed. But, according to the commission, the representation of these clients is "an art, not a science, and the risks are ever present." Further, the commission noted that immigration law attorneys "push the envelope in their cases and sometimes push to change the law—sometimes that works and sometimes it does not." The commission emphasized the need to balance "enforcement of the

[disciplinary rules] with not creating standards that will have a chilling effect on the likelihood that lawyers will take on the risks of helping individuals living in the shadows." Nonetheless, the commission found that Said did not properly advise his clients to permit them to make informed choices about his risky strategies and revealed confidential information without client consent. As a result, the commission recommended that this court sanction Said by issuing a public reprimand.

## II. Standard of Review.

We review factual findings of the commission de novo. Iowa Ct. R. 36.22(4); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 101 (Iowa 2012). We give respectful consideration to commission findings, especially when considering credibility of witnesses, but are not bound by them. *Van Ginkel*, 809 N.W.2d at 101. The burden is on the Board to prove the charges by a convincing preponderance of the evidence. *Id.* at 102. A convincing preponderance of the evidence burden is higher than the burden in most civil cases but lower than a criminal prosecution and less stringent than the clear and convincing evidence standard used in some civil cases. *Id.*; *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 517 (Iowa 1996) (per curiam).

## III. Discussion of Legal Principles.

## A. Overview of Relevant Immigration Law.

1. *Introduction.* Before we consider whether Said violated the panoply of disciplinary rules as alleged by the Board, we explore the relevant immigration law framework of the four matters before us. The matters involving Ramirez Fernandez and Hernandez Ruiz involve the impact of Said's representation on removal proceedings and Said's clients' applications for cancellation of removal proceedings. The matters involving Luna Carrillo and Alba Araniega involve applications for a U visa,

which if granted, permit undocumented persons to remain in the United States as a result of cooperation with law enforcement in certain matters. A working knowledge of these areas of immigration law provides the context for evaluating many of the Board's alleged violations of disciplinary rules in this case.

2. *Removal and cancellation.* Under immigration law, undocumented persons physically present in the United States are subject to removal. 8 U.S.C. § 1182(a)(6)(A)(i). A person subject to a removal, however, may apply for cancellation of removal. *Id.* § 1229b(b)(1). Said represented both Ramirez Fernandez and Hernandez Ruiz in connection with removal proceedings and filed applications for cancellation of removal on behalf of both clients.

Cancellation of removal is designed to permit undocumented persons to remain in the United States where removal would cause extreme hardship. *Id.* § 1129b(b)(1)(D). In order to qualify for cancellation of removal the applicant must prove (1) presence in the United States for at least ten years, (2) continuous residence in the United States for the duration, (3) good moral character, and (4) extreme hardship on family members. *Id.* § 1229b(b)(1).

With respect to the third element, a person who commits a "crime involving moral turpitude" cannot show good character and is not eligible for cancellation. *Id.* § 1182(a)(2)(A)(i)(I). The term "crime involving moral turpitude" is not defined in the statutes and its ambiguous character has been noted by commentators and in the caselaw. *See, e.g., Partyka v. Att'y Gen.,* 417 F.3d 408, 409 (3d Cir. 2005) (characterizing moral turpitude cases as an "amorphous morass"); *Quilodran-Brau v. Holland,* 232 F.2d 183, 184 (3d Cir. 1956) ("The border line of 'moral turpitude' is not an easy one to locate."); *In re Tran,* 21 I. & N. Dec. 291, 292 (B.I.A. 1996) (noting

moral turpitude was a "nebulous concept"); Mary Hoper, *Deportation for a Sin: Why Moral Turpitude is Void for Vagueness*, 90 Neb. L. Rev. 647, 678–79 (2012). In any case, conviction of a crime involving moral turpitude where the potential penalty exceeds one year or the actual sentence exceeds six months renders the undocumented person "inadmissible," but there is an exception for certain petty offenses under 8 U.S.C. § 1182(a)(2)(A)(ii)(II).

On the advice of Said, Ramirez Fernandez and Hernandez Ruiz pleaded guilty to the crime of fraudulent practice in the fourth degree under Iowa Code section 714.12 as a result of their use of a false Social Security number to register vehicles with the DOT. The question arises whether this crime amounts to a "crime involving moral turpitude." If so, Ramirez Fernandez and Hernandez Ruiz, by pleading guilty, would no longer be eligible for cancellation of removal.

The caselaw regarding whether conviction of a crime arising from the use of a false Social Security number by an undocumented person is a crime involving moral turpitude is mixed. In *Beltrane-Tirado v. INS,* the United States Court of Appeals for the Ninth Circuit concluded that the use of a false Social Security number did not amount to a crime involving moral turpitude under immigration law. 213 F.3d 1179, 1184 (9th Cir. 2000). There is some support for that position in the Second Circuit and more recently in the Seventh Circuit. *See Ahmed v. Holder,* 324 F. App'x 82, 84 (2d Cir. 2009) (["A] person who secures employment on the basis of a false social security number has the intent to deceive the employer and violates § 408(a)(7)(B), but has not necessarily acted with the intent to defraud the employer or the government. For this reason, Ahmed's case is distinguishable from the many cases holding crimes of fraud to be crimes involving moral turpitude."); *Arias v. Lynch,* 834 F.3d 823, 826–29

(7th Cir. 2016) ("A rule that all crimes that involve any element of deception categorically involve moral turpitude would produce results at odds with the accepted definition of moral turpitude as conduct that is 'inherently base, vile, or depraved.' ").

The majority of caselaw, however, points in a different direction. For instance, in *Hyder v. Keisler*, the Fifth Circuit held that use of a false Social Security number amounted to a crime involving moral turpitude. 506 F.3d 388, 391–92 (5th Cir. 2007). The same result occurred in the Sixth, Tenth, and Eleventh Circuits. *See Moreno-Silva v. U.S. Att'y Gen.*, 481 F. App'x 611, 613 (11th Cir. 2012) (per curiam); *Rodriguez-Heredia v. Holder*, 639 F.3d 1264, 1268–69 (10th Cir. 2011); *Serrato-Soto v. Holder*, 570 F.3d 686, 690–92 (6th Cir. 2009).

In *Guardado-Garcia v. Holder*, the Eighth Circuit considered a case where an immigrant pled guilty to misuse of a Social Security number in violation of 42 U.S.C. § 408(a)(7)(B). 615 F.3d 900, 901 (8th Cir. 2010). Guardado-Garcia used a Social Security number not assigned to him to obtain an employee identification badge at Lambert-St. Louis International Airport. *Id.* at 901. The identification badge gave Guarrdado-Garcia access to secure areas at the airport. *Id.* The Board of Immigration Appeals approved a finding that Guardado-Garcia was inadmissible, noting that "in view of the potential security threats to the United States," it is "definitely in the interest of this country to make sure these numbers are appropriately assigned." *Id.* The board thus agreed that the "crime involv[ed] moral turpitude because it involved 'both an intent to deceive and an impairment of government function.' " *Id.*

The *Guadardado-Garcia* court affirmed the Board's determination. The court cited with approval language from a prior opinion, *Lateef v. Department of Homeland Security*, where the court stated that "[c]rimes

involving the intent to deceive or defraud are generally considered to involve moral turpitude." *Id.* at 902 (quoting *Lateef v. Dep't of Homeland Sec.*, 592 F.3d 926, 929 (8th Cir. 2010)). In *Lateef*, the court expressly rejected the Ninth Circuit's approach in *Beltran-Tirado*. *Lateef*, 592 F.3d at 930–31.

In addition to disagreement regarding substance, there has been controversy regarding the proper method of resolving whether a conviction is a crime involving moral turpitude. The United States Attorney General at one point promulgated guidance, but that authority was subsequently rescinded after it was not followed by several circuits.

The United States Supreme Court entered the fray in *Mathis v. United States*. ___ U.S. ___, 136 S. Ct. 2243 (2016). In *Mathis*, the Supreme Court considered what crime amounted to a predicate violent offense under the Armed Career Criminal Act, 18 U.S.C. § 924(a). *Mathis*, ___ U.S. at ___, 136 S. Ct. at 2248–50. The Supreme Court held that when a statute provided multiple avenues to convict a defendant of a crime, a court should use a "modified categorical approach" to determine which alternative applied to the defendant. *Id.* at ___, 136 S. Ct. at 2249. In applying such an approach, the court would look at a limited set of documents to make the determination. *Id.* at ___, 136 S. Ct. at 2249. After *Mathis*, the question arose whether the modified categorical approach should be used in immigration cases to determine whether a defendant was convicted of a crime involving moral turpitude.

Recently, the Eighth Circuit decided *Pereida v. Barr*. 916 F.3d 1128 (8th Cir. 2019). In *Pereida*, an unlawfully present immigrant attempted to use a fraudulent Social Security card to obtain employment, a crime under state law. *Id.* at 1130; *see also* Neb. Rev. Stat. Ann. § 28-201(1)(b) (West, Westlaw current through 2d Reg. Sess. 106th Legis. (2020)). The *Pereida*

court characterized the determinative issue as whether the immigrant's conviction qualified as a crime involving moral turpitude, making him ineligible for cancellation of removal.  916 F. 3d at 1130.

In *Pereida,* an immigration judge had determined that the Nebraska statute was divisible and that some of the crimes did not require intent to defraud.  *Id.* at 1130–31.  Upon examination of underlying court documents, however, the immigration judge concluded that no determination could be made as to which section of the Nebraska statute supported Pereida's conviction.  *Id.* at 1131.  Under the circumstances, the immigration judge held it was Pereida's burden to show that his crime did not involve fraudulent intent, and because he had failed to do so, he was statutorily ineligible for cancellation of removal.  *Id.*

Citing *Mathis,* the Eighth Circuit affirmed.  *Id.* at 1132–33 (citing *Mathis,* ___ U.S. at ___, 136 S. Ct. at 2249).  The Eighth Circuit applied the modified categorical approach outlined in *Mathis.*  *Id.* at 1132 (citing *Mathis,* ___ U.S. at ___, 136 S. Ct. at 2249).  It agreed that the statute was divisible, but based on the limited relevant class of documents, the court could not determine precisely which crime supported Pereida's conviction. *Id.* at 1132–33.  At that point, the Eighth Circuit emphasized, the burden shifted to Pereida to establish his entitlement to relief.  *Id.* at 1133.  Because the Eighth Circuit could not determine which crime supported Pereida's conviction, it declined to consider the substantive question of whether any particular crime under the statute was not a crime involving moral turpitude under the approach of *Beltran-Tirado* or *Arias v. Lynch.* *Id.*

The United States Supreme Court granted certiorari.  *Pereida v. Barr,* ___ U.S. ___, 140 S. Ct. 680 (2019) (mem).  The matter is currently

pending. The grant of certiorari, at a minimum, suggests the uncertainty of the law in this area.

3. *Contours of the U visa program.* Congress passed the Victims of Trafficking and Violence Protection Act of 2000 to protect victims of certain crimes, regardless of immigration status. Pub. L. No. 106–386, 114 Stat. 1464 (2000) (codified as amended in scattered sections of the U.S.C. (2000)). Among other things, the legislation provided protection for certain immigrants unlawfully present in the country when they cooperate with law enforcement in the prosecution of crime, now known as a U visa. Battered Immigrant Women Protection Act of 2000, Pub. L. No. 106–386, § 1513, 114 Stat. 1518, 1534–35 (2000) (codified at 8 USCA § 1101(a)(15)(U) (2000)). A person unlawfully in the United States who receives a U visa may remain in the United States notwithstanding the immigrant's otherwise unlawful status for a period of four years, with eligibility after three years to apply for permanent residency on humanitarian grounds. *See* 8 U.S.C. §§ 1184(p)(6); 1255(m)(l) (2018).

In order to qualify for a U visa, the immigrant must first show "substantial physical or mental abuse as a result of having been a victim of criminal activity described" in the statute. *Id.* § 1101(a)(15)(U)(i)(I). The statute provides a lengthy list of qualifying crimes, which include a number of sexual offenses such as rape, incest, sexual assault, abusive sexual contact, sexual exploitation, and female genital mutilation and also some nonsexual crimes such as domestic violence, murder, manslaughter, kidnapping, blackmail, extortion, witness tampering, and obstruction of justice, as well as an attempt, conspiracy, or solicitation to commit any of the listed crimes. *Id.* § 1101(a)(15)(U)(iii).

In addition, the immigrant victim must show that the immigrant victim possessed information regarding the criminal activity and that

immigrant victim must have been "helpful, is being helpful, or is likely to be helpful," in the investigation or prosecution of the criminal case. *Id.* § 1101(a)(15)(U)(i)(III). In order to establish helpfulness, the applicants for a U visa must obtain a certification from a judge, law enforcement officer, or prosecutor stating that they have helped or are helpful with an investigation of one of the listed qualifying crimes. *Id.* § 1184(p)(1). Finally, the immigrant victim must show that the criminal activity "violated the laws of the United States or occurred in the United States . . . or the territories and possessions of the United States." *Id.* § 1101(a)(15)(U)(i)(IV).

The United States Customs and Immigration Service has provided guidance to potential applicants in the *U Visa Law Enforcement Resource Guide.* U.S. Dep't of Homeland Sec., U Visa Law Enforcement Certification Resource Guide (2012), https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/IMM-Gov-DHSUVisaCertificationGuide.pdf [https://perma.cc/J3WA-PQYV]. The guide provides a general outline of the requirements to obtain the U visa. *See generally id.* Among other things, the guide notes that immediate family members of U visa recipients may also be eligible to live and work in the United States. *Id.* at 5. The guide also provides that "given the complexity of U visa petitions, petitioners often work with a legal representative or victim advocate." *Id.* at 2.

In order to obtain a U visa, the applicant must file with immigration authorities an I-918 Petition for U Nonimmigrant Status and an I-918 Supplement B Form.[1] *Id.* The I-918 Petition is an eleven-page form with multiple fill-in boxes, check-the-box questions, and an opportunity to

---

[1]Both forms are available at https://www.uscis.gov/I-918.

provide additional information. U.S. Dep't of Homeland Sec., *Petition for U Nonimmigrant Status* (Apr. 24, 2019). The I-918 Supplement B is the form for the certification by law enforcement. *Id.* The five-page form asks for, among other things, a description of the criminal activity being investigated or prosecuted and the involvement of the applicant. *Id.* at 2–4. Copies of relevant reports and findings are to be attached to the form. *Id.* at 2. The I-918 Supplement B requires certification that the immigrant victim possessed information about the identified criminal activity and that the information has been, is being, or is likely to be helpful in the investigation or prosecution of the criminal activity detailed in the report. *Id.* at 4. The U Visa Resource Guide, after describing the I-918 Supplement B form, states that "[w]ithout a completed U visa certification, the victim will not be eligible for a U visa." U.S. Dep't of Homeland Sec., *U Visa Law Enforcement Certification Resource Guide* at 3.

4. *Ineffective assistance of counsel.* In *Padilla v. Kentucky*, the United States Supreme Court considered whether a lawyer with an immigration client provided effective representation when, in the context of a plea bargain, the lawyer failed to advise the client of the immigration consequences of the plea. *Padilla*, 559 U.S. at 359, 130 S. Ct. at 1477–78. This court analyzed the responsibilities of a lawyer in an immigration context in *Diaz v. State*. 896 N.W.2d 723 (Iowa 2017). In *Diaz*, we found counsel ineffective for failure to advise a client about the immigration consequences of a guilty plea. *Id.* at 734. Among other things, we declared, "Whether or not deportation consequences are certain or possible under a criminal charge, the specific statutory consequences need to be explained with reasonable clarity so a full and measured decision to plead guilty can be made." *Id.* at 732.

### B. Overview of Disciplinary Rules.

1. *Introduction.* Having established the immigration law framework in which these four matters arise, we now explore the general framework of the disciplinary rules the Board alleges were violated by Said.

2. *Competence.* Rule 32:1.1 requires that an attorney act with competence in the course of representation. Iowa R. Prof'l Conduct 32:1.1. Lack of competence may be shown where an attorney lacks "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation" or upon a showing that the attorney failed "to make a competent analysis of the factual and legal elements of a client's legal problem." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 484–85 (Iowa 2014) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Wright*, 840 N.W.2d 295, 300 (Iowa 2013)). An act of malpractice, however, does not necessarily show incompetence, but may show merely a mistake that falls below the standard of care expected of a practicing attorney. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Wintroub*, 745 N.W.2d 469, 475 (Iowa 2008). Similarly, even in more egregious cases where neglect has been shown by repeated deficiencies, we have stated that "mere neglect of client matters does not establish a lack of competence." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Baldwin*, 857 N.W.2d 195, 205 (Iowa 2014) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Conroy*, 845 N.W.2d 59, 64 (Iowa 2014)).

For example, in *Iowa Supreme Court Attorney Disciplinary Board v. Baldwin*, we found that repeated failures to comply with our rules of procedure and our court ordered deadline did not arise to incompetence. *Id.* at 205–06. But while failure to follow rules and meet deadlines may in some cases be neglect, persistent and profound failure may move from neglect to incompetence. In *Iowa Supreme Court Attorney Disciplinary*

*Board v. Conroy*, the attorney was found incompetent when he admitted that he had no experience with appeals, did not reach out to an experienced attorney, did not read the appellate rules, did not understand that appeals are time sensitive, and was unsure how to proceed with appeals. 845 N.W.2d at 64. Similarly, an attorney was found not to have provided competent representation where he admitted multiple times at a hearing that he "lacked the experience" to handle a toxic tort case and that he served no written interrogatories or requests for production of documents, failed to secure an expert, and took no depositions. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Beauvais*, 948 N.W.2d 505, 512–13 (Iowa 2020).

In sum, the disciplinary rules collectively establish a spectrum of conduct. At the one end is a mere mistake or error of judgment that does not amount to a violation of disciplinary rules, in the middle is professional neglect arising from repeated problems, and at the far end is persistent and profound professional incompetence. Each category, of course, shades into the other. It is our responsibility in this case to determine where Said's conduct falls on the spectrum under all the facts and circumstances in his representation of the four immigration clients.

3. *Reasonable diligence and promptness.* Iowa Rule of Professional Conduct 32:1.3 requires an attorney to handle client matters with reasonable diligence and promptness. A single missed deadline does not establish a violation of the rule. *See, e.g.*, *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Morse*, 887 N.W.2d 131, 141 (Iowa 2016); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Hedgecoth*, 862 N.W.2d 354, 361 (Iowa 2015). But the mere fact that an attorney has a busy practice does not excuse violations. An attorney must manage caseloads so that they may handle cases

competently and with reasonable promptness and diligence. *Akron Bar Ass'n v. DeLoach*, 34 N.E.3d 88, 91 (Ohio 2015) (per curiam).

4. *Attorney client disclosures and communications.* The Iowa Rules of Professional Conduct contain three provisions related to attorney client disclosures and communications. Iowa Rule of Professional Conduct 32:1.4(a)(2) requires an attorney to reasonably consult with the client to achieve the client's objectives. Rule 32:1.4(b) requires an attorney to communicate with a client to the extent necessary to allow the client to make informed decisions. Rule 32:1.4(a)(5) provides it is an ethical violation to fail to consult with a client regarding relevant limitations on the lawyer's conduct.

Under our cases, an attorney must provide a client with sufficient guidance to permit the client to make an informed decision. *See, e.g., Iowa Sup. Ct. Att'y Disciplinary Bd. v. Turner*, 918 N.W.2d 130, 146 (Iowa 2018) (holding that an attorney must provide the client with sufficient guidance to make an informed decision on which bankruptcy to file). Similarly, we have held that an attorney must keep a client sufficiently informed so that the client may participate in the development of their case. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Noel*, 933 N.W.2d 190, 200–01 (Iowa 2019). We have applied these principles in several immigration law cases. *See, e.g., Said*, 869 N.W.2d at 195 (determining that failure to advise client of dismissal and missed deadline constituted ethics violations); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Mendez*, 855 N.W.2d 156, 170 (Iowa 2014) (determining that a failure to advise of missed deadline constituted an ethics violation); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Yang*, 821 N.W.2d 425, 430 (Iowa 2012) (determining that the failure to explain to client grounds for reopening proceeding constituted an ethics violation).

In addition, an attorney is expected to periodically communicate with clients about the status of representation. For instance, an attorney who failed to communicate with a client for four months was found to violate rule 32:1.4(a)(3). *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Weiland*, 885 N.W.2d 198, 209 (Iowa 2016); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barry*, 908 N.W.2d 217, 224 (Iowa 2018) (determining that the failure, over a one-year period of time, to inform client of status of divorce petition constituted an ethics violation); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Dolezal*, 796 N.W.2d 910, 917 (Iowa 2011) (determining that the failure to communicate over a period of two years despite client efforts to contact the attorney constituted an ethics violation).

5. *Conflict of interest.* Rule 32:1.7(a) provides that an attorney may not represent a client when the attorney has a concurrent conflict of interest. Ordinarily, an attorney, of course, cannot simultaneously represent a client and be a witness against the client in a proceeding. *See* Iowa R. of Prof'l Conduct 32:3.7. In one case, we approved the action of the district court removing an attorney from a case before trial where the attorney would likely have been called as a witness. *State v Vanover*, 559 N.W.2d 618, 629–31(Iowa 1997). Generally speaking, however, an attorney is only considered a necessary witness in a proceeding and therefore subject to disqualification as the advocate in the same proceeding if (1) the testimony is material to the issues being litigated, (2) the evidence is unobtainable elsewhere, and (3) the testimony is or may be prejudicial to the client. *See United States v. Melton*, 948 F. Supp. 2d 998, 1006–08 (N.D. Iowa 2013).

The court of appeals already addressed the implications of Said being listed as a witness in the criminal proceedings involving Ramirez Fernandez. *Fernandez*, 2018 WL 3471591 at *8–9. According to the court

of appeals, Said had a current conflict of interest because he might have had an interest in resolving the matter before the potential conflict ripened. *Id.* Further, according to the court of appeals, Said may have not considered potential defense tactics, including seeking to suppress statements made to the DOT investigator based on breach of attorney client privilege. *Id.* at *9.

6. *Unreasonable attorney fees.* Under Iowa Rule of Professional Conduct 32:1.5(a), an attorney may not charge or collect an "unreasonable fee." The rule provides a multifactored test to determine reasonableness, including,

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent.

*Id.*

There are other disciplinary rules that may implicate the payments of fees; for example, those related to safekeeping of client property for fee payments made before they are earned. Iowa R. of Prof'l Conduct 32:1.15. In this case, however, the Board only alleged a violation of the fee as

unreasonable under rule 32:1.5(a).  We thus have no occasion to consider other potential violations related to fees, particularly those that might be associated with "flat fees."  *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Frerichs*, 671 N.W.2d 470, 475–76 (Iowa 2003).

**IV.  Application of Disciplinary Rules to the Four Complainants.**

**A. Issues Arising from Said's Representation of Ramirez Fernandez.**

1. *Competence.*  The first disciplinary charge brought by the Board is that Said incompetently represented Ramirez Fernandez.  Iowa R. Prof'l Conduct 32:1.1.  First, the Board maintains that Said demonstrated incompetence when he encouraged Ramirez Fernandez to self-report his use of a false Social Security number to register automobiles as part of an effort to obtain a driver's license from the DOT.  Second, the Board maintained that Said was incompetent when he advised Ramirez Fernandez to plead guilty to fraudulent practice in the fourth degree.

According to the Board, Said knew that Ramirez Fernandez, by self-reporting his use of a false Social Security number to register vehicles, would have no defense to a charge of fraudulent practice in the third degree under Iowa Code section 714.11.  Further, the  Board argued that based on his experience, Said knew that Ramirez Fernandez would be cited by the DOT for fraudulent practice in the third degree, that the best plea bargain he could obtain from the Polk County Attorney's Office was for fraudulent practice in the fourth degree, that the crime of fraudulent practice in the fourth degree was certainly a crime involving moral turpitude under prevailing immigration law, and that pleading guilty to a crime involving moral turpitude would prevent him from pursuing his application for cancelation of removal.  As a result, the Board claimed that

Said's course of action virtually ensured that his cancellation of removal effort would fail with little upside to Ramirez Fernandez.

Said countered that his client was in a difficult position and that he was trying to do his best to extricate him. Ramirez Fernandez was unlawfully in the United States and had committed a crime when he used a false Social Security number to register vehicles. By stepping forward on the false use of Social Security numbers, Said argued that his client could obtain a valid driver's license, which would prevent him from being arrested for driving without a license. Such an arrest, according to Said, could lead to revocation of his prior release by immigration authorities.

Said recognized that pleading guilty to fraudulent practice in the fourth degree could be considered a crime involving moral turpitude. Said claimed, however, that he would contest such a finding, including launching an appeal in the Supreme Court of the United States.

By obtaining a driver's license, Said asserted that Ramirez Fernandez avoided the prospect of being charged with driving without a license while operating a motor vehicle. The upside, however, was limited. In the past, when Ramirez Fernandez was found to be driving without a license, he was simply issued a citation.

Exactly what amounts to a crime involving moral turpitude has been subject to considerable debate in the caselaw. The experts battled it out on that question. In our view, we tend to side with Pritchett's view that recent immigration cases involving fraud, including those coming out of the Omaha immigration court and the Eighth Circuit, show little prospect of avoiding a classification as a crime involving moral turpitude.

But it cannot be said that the prospect is zero. The United States Supreme Court in recent years has decided cases somewhat favorable toward the legal position advocated by illegal immigrants. *See, e.g.,*

*Mathis*, ___ U.S. ___, 136 S. Ct. at 2254 (discussing the proper use of the modified categorical approach and stating that "it is not to be repurposed as a technique for discovering whether a defendant's prior conviction, even though for a too-broad crime, rested on facts (or otherwise said, involved means) that also could have satisfied the elements of a generic offense."); *Descamps v. United States*, 570 U.S. 254, 270–71, 133 S. Ct. 2276, 2289 (2013) (discussing divisibility of a criminal statute in determining whether past conviction is for a violent felony). A zealous attorney could argue in good faith that the cases declaring all crimes involving fraud amount to a crime involving moral turpitude are simply wrong.

The fact that Said did not seem to understand how long the odds are on the moral turpitude question raises a question of whether he engaged in competent analysis of the factual or legal elements of the matter. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Thomas*, 794 N.W.2d 290, 293 (Iowa 2011). Further, it must be observed that time was on the side of Ramirez Fernandez. The DOT official responsible for enforcement believed that the statute of limitations related to the fraudulent use of a Social Security number to title a vehicle was three years. All Ramirez Fernandez needed to do was wait until the time had expired and then apply for a driver's license. Said, however, did not tell Ramirez Fernandez of the option of not driving until he was in the clear.

But the prospects of prevailing on such an argument before an immigration judge would be quite low in light of prior rulings, precedents of the Board of Immigration Appeals, and decisions of the Eighth Circuit. In order to succeed, there would have to be some significant development, such as an intervening favorable United States Supreme Court precedent that restructured the analysis of what amounts to a crime involving moral

turpitude, or perhaps a change in the Executive Branch leading to a different approach to prosecutorial discretion.

The commission declined to make a finding that the decision to proceed with a driver's license application after disclosing false use of a Social Security number violated our rule regarding incompetence. But it does not seem a very sound approach. The upside appears minimal, while the downside is weighty. It may amount to an act of malpractice. But given the record developed in this case, it may be more accurately characterized as questionable judgment rather than incompetence. We therefore agree with the commission that the Board failed to show that Said was incompetent by a preponderance of the evidence under Iowa Rule of Professional Conduct 32:1.1.

2. *Informed consent/reasonable consultation.* The Board argued that Said failed to adequately disclose and communicate to Ramirez Fernandez the risks of his recommended course of action, and as a result, Said violated our disciplinary rules relating to informed consent and reasonable consultation. Iowa R. of Prof'l Conduct 32:1.4(a)(1)–(2). First, the Board alleged that before Ramirez Fernandez decided to seek a driver's license and disclose his prior use of a false Social Security number, Said should have explained the weighty immigration risks and explored the possibility of Ramirez Fernandez delaying seeking a driver's license until the statute of limitations expired on any potential fraudulent practice charge. Second, the Board reasoned that during the plea bargaining stage of the fraudulent practice proceeding, Said should have explained to Ramirez Fernandez the likely negative impact of the plea deal on the cancellation of removal.

We agree with the commission that Said did not adequately inform Ramirez Fernandez about the risks of his decision to seek a driver's license

and Said's plan to disclose his false use of a Social Security number. Ramirez Fernandez was entitled to have a full understanding that while there was an upside to obtaining a driver's license, namely, he could drive legally without fear or arrest for unlicensed driving, there was a clear and palpable downside that his application for cancellation of removal could be irreparably or materially damaged by a criminal prosecution related to the false use of a Social Security number. *Diaz*, 896 N.W.2d at 732.

He further failed to provide adequate disclosures prior to Ramirez Fernandez pleading guilty. In this case, it may not be a complete certainty that pleading guilty to fraudulent practice in the fourth degree would foreclose pursuing cancellation of removal, but it would obviously and indisputably have been a very substantial problem for Ramirez Fernandez in his immigration proceedings. He was entitled to know that before making important decisions.

We therefore agree with the commission that the Board established by a convincing preponderance of the evidence that Said violated Iowa Rules of Professional Conduct 32:1.4(a)(1) and 32:1.4(a)(2) in his representation of Ramirez Fernandez.

3. *Unauthorized disclosure of client information.* The Board charged that Said provided client information to the DOT without the consent of Ramirez Fernandez in violation of Iowa Rule of Professional Conduct 32:1.6(a). Based on our de novo review of the record, Said did not obtain his client's consent before he communicated with DOT investigator Sharr about the use of false Social Security numbers to title vehicles. We therefore agree with the commission that the Board established by a convincing preponderance of the evidence that Said violated Iowa Rule of Professional Conduct 32:1.6(a) in his representation of Ramirez Fernandez.

4. *Concurrent conflict.* The Board alleges that Said violated our rules regarding concurrent conflict by representing Ramirez Fernandez in connection with the fraudulent practice charge when Said was listed as a witness. Iowa R. of Prof'l Conduct 32:1.7(a)(2). The Board maintains that Said could not represent Ramirez Fernandez in a criminal matter when he was going to be called as a witness in the same proceeding. Said argues that although he was listed as a witness, there was not a realistic prospect that he would actually be called as he was not a necessary witness to an undisputed fact. The commission rejected the Board's argument.

There is authority for the proposition that an attorney cannot represent a client in a proceeding where the attorney will be called as a witness. *Vanover,* 559 N.W.2d at 629–31. However, Said was not a necessary witness in the criminal proceeding. The state had all the evidence it needed through the admissions of Ramirez Fernandez, the testimony of its investigator, and its own records to show that Ramirez Fernandez had used a false Social Security number in the past to title vehicles. As a result, there was no realistic prospect that Said would be called as a witness against his client. *See Melton,* 948 F. Supp.2d at 1006–08.

But that is not the end of the issue. Even if there is no present basis for disqualification, the question remains whether Said should have disclosed to Ramirez Fernandez the potential conflict and its impact on his current reputation. *See Fernandez,* 2018 WL 3471591 at *8-9 (noting that the lawyer faced a conflict with the client when listed as a witness and did not seek waiver); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Qualley,* 828 N.W.2d 282, 289–91 (Iowa 2013) (finding violation of Iowa Rule of Professional Conduct 32:1.4(a) where attorney did not advise client of conflict of interest).

We conclude that Said should have disclosed to his client that he was listed as a witness in the criminal proceeding and sought a waiver of the potential conflict. It may be that the client would have voluntarily signed the waiver as inconsequential. But Said was required to provide the client with sufficient information to allow the client to be sufficiently informed to decide whether to waive the potential conflict or seek new counsel.

5. *Unreasonable attorney fees.* In this case, Said utilized a fee contract that charged a flat fee of $6000 for services in the Ramirez Fernandez immigration case but called for additional fees on an hourly basis should the matter become contested.

On December 23, 2013, Said was admonished for using a fee contract with similar language. The letter of admonition noted that it is hardly plausible that a matter involving deportation would be uncontested and, as a result, the fee agreement was misleading in suggesting the possibility that the flat fee would cover all services. The letter of admonition further noted that the agreement "in effect allowed you to take a minimum, earned-upon-receipt retainer fee before performing significant work on the case, and then to take an hourly fee for work actually performed." The Board gave Said the benefit of the doubt that he did not intend to mislead the complainant or seek unreasonable fees. As a result, the Board concluded that an admonition would be sufficient for Said's charging of an unreasonable fee in violation of Iowa Rule of Professional Conduct 32:1.5(a) and his failure to explain the basis of the fee at the outset of representation in violation of Iowa Rule of Professional Conduct 32:1.5(b). The letter further admonished Said to "immediately desist from using fee agreements which are misleading to the client and which provide

you the ability to claim an earned-upon-receipt retainer fee without yet having performed substantial work."

Later, on June 25, 2015, Said was admonished in connection with premature collection of a flat fee. The Board noted that while Said again used a misleading form, the form was utilized prior to the December 23, 2013 admonition and further action was not warranted. The correspondence made it clear, however, that the Board disapproved of the fee agreement language Said used in flat-fee immigration cases.

Like the fee agreement involved in the June 25, 2015 letter, the fee arrangement here was entered into by the parties prior to the December 23, 2013 admonition. We do not believe that the addition of another objectionable form fee contract would have led to a different result in the prior disciplinary proceedings and we impose no additional sanction in this case.

With respect to representation in his criminal matter, Said charged a flat fee of $2000. The representation continued over a period of months. Under the totality of facts and circumstances, we agree with the commission that the Board failed to show, by a convincing preponderance of the evidence, that Said's flat fee of $2000 to represent Ramirez Fernandez was unreasonable in violation of Iowa Rule of Professional Conduct 32:1.5.

**B. Issues Arising from Said's Representation of Hernandez Ruiz.**

1. *Competence.* The competence issues related to Said's representation of Hernandez Ruiz are identical to those alleged in connection with Said's representation of Ramirez Fernandez. Having found no violation of Iowa Rule of Professional Conduct 32:1.1 in Said's representation of Ramirez Fernandez, we also find no violation here.

2. *Informed consent and inadequate disclosure.* As with Ramirez Fernandez, we also find that that Said failed to adequately disclose and communicate with his client regarding the immigration consequences of pleading guilty to fraudulent practice in the fourth degree. It is true, of course, the case is differentiated from Ramirez Fernandez because in that case, Said knew, in advance, that Ramirez Fernandez had used a false Social Security number to register vehicles in the past. In the Hernandez Ruiz matter, Said did not know that his client had used a false Social Security number when he traveled to the DOT to seek a driver's license. The commission found this key difference dispositive when it found that Said did not violate the ethical rules regarding informed consent and inadequate disclosure in his representation of Hernandez Ruiz.

But even though Said was not aware of the use of false Social Security numbers by Hernandez Ruiz when he first went to the DOT, the ethical obligations of Said toward his client did not stop at that point. Once the DOT was alerted to the situation, Hernandez Ruiz was still entitled to be fully informed by his lawyer of the consequences of any subsequent plea agreement and the possible choice of making the state prove its case in the criminal proceeding.

While Hernandez Ruiz may have been generally informed by Said and the court that his guilty plea could have negative immigration consequences, Said had more specific knowledge than reflected in this general admonition. Said knew that Hernandez Ruiz had a pending cancellation application and that by pleading guilty to fraudulent practice in the fourth degree, the immigration judge would almost certainly find that it was a crime involving moral turpitude and that Hernandez Ruiz could not seek cancellation of removal. Like Ramirez Fernandez, Hernandez Ruiz was entitled to know that before he pled guilty.

We therefore conclude that the Board proved by a convincing preponderance of the evidence that Said violated Iowa Rules of Professional Conduct 32:1.4(a)(1) and 32:1.4(a)(2) in his representation of Hernandez Ruiz.

3. *Revealing information without informed consent.* The Board charged that, as in the case of Ramirez Fernandez, Said revealed information to the DOT without his client's informed consent. The record shows, however, that Hernandez Ruiz first revealed information about his use of a false Social Security number to title a vehicle to the DOT staff without any involvement of Said. Any further disclosures by Said were simply consistent with his client's previous disclosure. Under these narrow circumstances, we do not find that the Board established by a convincing preponderance of the evidence that Said violated Iowa Rule of Professional Conduct 32:1.6(a) in his representation of Hernandez Ruiz.

4. *Concurrent conflict.* The Board's claim of concurrent conflict with respect to Hernandez Ruiz is parallel to its charge against Said based on his representation of Ramirez Fernandez. As in the Ramirez Fernandez matter, we find Said violated Iowa Rule of Professional Conduct 32:1.7(a)(2) by not disclosing the potential conflict to his client and Iowa Rule of Professional Conduct 32:1.7(b)(4) for not obtaining informed consent to any potential conflict.

5. *Unreasonable attorney fees.* The Board claims that the flat fee of $2000 charged by Said to represent Hernandez Ruiz in the criminal proceeding was unreasonable under Iowa Rule of Professional Conduct 32:1.5(a). We note that the commission concluded that Said's fees were not unreasonable. It is true, as it turned out, that the work performed by Said under the fee agreement was done over no more than a two-day period. At the time of contract execution, however, Said was at risk that

the plea negotiations could have been more complicated and extended over a longer period of time. It is in the nature of flat-fee agreements that sometimes a lawyer receives a premium for work performed; while on other occasions, the work is far less profitable. Like the commission, we decline to find the flat-fee agreement unreasonable under all the circumstances in this case.

**C. Issues Arising From Said's Representation of Irma Luna Carrillo.**

1. *Competence.* The Board charged that Said was incompetent for undertaking representation of Luna Carrillo in connection with her application of a U visa when she had no chance of success under Iowa Rule of Professional Conduct 32:1.1. According to the Board, this was frivolous and, as a result, the fee charged for a frivolous matter is unreasonable and in violation of our disciplinary rules.

But the expert testimony was contradictory on this point. To some extent, the issue reveals an attorney's risk tolerance or willingness to tug and pull at the edges of the law. In immigration law, asserting long odds claims may be all that a client has. We are inclined to agree with expert Williamson on this one, namely, that Said's approach was "clever" in a positive sense and might have a chance if properly developed.

The client, of course, ordinarily should be reasonably advised by counsel about the fact that such an application would be a long shot. The Board makes no claim, however, that Said breached a disciplinary rule by failing to provide sufficient information to allow Luna Carrillo to make an informed decision about whether to proceed with the U visa application.

2. *Unreasonable attorney fees.* The Board alleged that Said charged Luna Carrillo an unreasonable fee under Iowa Rule of Professional Conduct 32:1.5(a). Whether the fee was excessive turns on the question

of whether pursuit of a U visa application was frivolous. In our view, given the proverbial battle of experts, we are not prepared to say the application was frivolous. Once again, however, while Said's communications with his client may have been less than optimum, we are not prepared to label his efforts as frivolous.

**D. Issues Arising from Said's Representation of Susan Alba Araniega.**

1. *Incompetent representation and reasonable diligence and promptness.* The Board charged that Said performed incompetently in connection with the preparation of a U visa application for Alba Araniega under Iowa Rule of Professional Conduct 32:1.1. The Board also suggested that because the preparation of the U visa was taking months, Said acted without reasonable diligence or promptness in violation of Iowa Rule of Professional Conduct 32:1.3(b).

Based on our review of the record, we find the Board failed to prove by a convincing preponderance of the evidence either of the charges. While it is true that the application may have taken longer than anticipated to prepare, the file was generally active during the time frame of the representation. Some of the delay was clearly due to the client, who did not provide Said with her statement until many months into the representation. While the matter was complicated by Said's suspension, other lawyers in the office worked the file in his absence. While the six-month time frame for a law enforcement certificate expired, the experts were divided on whether the best course of action was to file an incomplete application or to get a new certification and file a complete application.

It is true, of course, that because of the delay, the law enforcement certification expired. But the certification was signed by a local judge, and Said had every reason to think a new certificate could be obtained. Given

the conflicting expert testimony on the best course of action, we do not think the Board has demonstrated that Said was incompetent in not filing an incomplete form with immigration authorities.

In the background, there may be a question of whether Said has taken on too many clients to handle properly. His disciplinary history suggests he may be prone to shortcuts. But in this particular case, on the record presented, we do not think the Board has carried its burden of showing a violation of our disciplinary rule related to promptness and diligence by a convincing preponderance of the evidence.

2. *Unreasonable attorney fees.* The Board alleged that in connection with his representation of Alba Araniega, Said charged an unreasonable fee and failed to deliver the clients funds to which the client is entitled. But Said produced an itemized statement showing work on the file that was not challenged at the hearing. Based on our review of the record, we, like the commission, conclude that the Board failed to establish by a convincing preponderance of the evidence that Said charged Alba Araniega an unreasonable fee.

**V. Appropriate Sanction.**

We now consider the appropriate sanction in this case. As can be seen above, we have found that Said violated several of our disciplinary rules in connection with the representation of Ramirez Fernandez and Hernandez Ruiz. Although we have declined to find Said incompetent, the record reveals that he did not involve his clients appropriately in critical decisions that had the potential to profoundly affect their future. The record reflects that in these cases, Said did not take the time to properly provide his clients with the understanding necessary to permit them to determine the most appropriate course of conduct to protect their interests.

As indicated by the commission, the main mitigating factor here is the fact that Said represents an underserved population facing the most difficult legal problems. This kind of representation is not for every lawyer. It certainly takes grit, stamina, and a tolerance of battle in the face of very long odds. In Said's prior disciplinary matter, we recognized his service to a vulnerable population as a mitigation factor. *Said*, 896 N.W.2d at 194. We today also recognize Said's service as a mitigating factor.

Said also testified that he has taken internal steps to prevent further disciplinary problems. In particular, he seeks written consents from clients related to certain proposed courses of action. It is not entirely clear whether such written consents are designed to paper the file or improve Said's communications with clients. We give him the benefit of the doubt, however, and regard his internal changes in his manner of practice as a mitigating factor in this case. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 543 (Iowa 2013).

But the practice of law requires that an attorney have sufficient patience and awareness to ensure necessary and desirable client participation in the attorney's representation. In that regard, the main aggravating feature in this case is Said's disciplinary record. In 2015, Said was suspended for a number of violations, including his failure to keep client's informed about their case and failing to explain matters to a client in violation of Iowa Rule of Professional Conduct 32:1.4(a)(3) and subsection (b). Here we are again with similar issues. And, he has received six private admonitions from the Board on a wide range of issues including failure to provide itemized billings, conflicts of interest, filing frivolous applications, lack of diligence, charging an unreasonable fee, and using a misleading term in fee contracts. Such private admonitions are

not discipline, but they put Said on notice of his tendency to have unsatisfactory relationships with clients.

Plainly, Said's prior disciplinary record is an aggravating factor. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Hier*, 937 N.W.2d 309, 317 (Iowa 2020); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Parrish*, 925 N.W.2d 163, 181 (Iowa 2019). Another aggravating factor is Said's substantial experience as an attorney. *Parrish*, 925 N.W. 2d at 181. In addition, we cannot overlook what the commission characterized as his "glib" attitude toward his former clients and the disciplinary proceedings. Our review of the record suggests that Said is irritated by the oversight of the practice of law imposed by our disciplinary rules.

Said makes client decisions on his own, too quickly, and without adequate client involvement. This behavior needs to stop. Based on the totality of circumstances, we conclude a suspension of thirty days is required to once again emphasize to Said that what the client thinks matters.

## VI. Conclusion.

For the above reasons, we suspend the license of Said to practice law for thirty days. The suspension applies to all facets of the practice of law. Iowa Ct. R. 34.23(3). Said must comply with the notification requirements of Iowa Court Rule 34.24, and costs are taxed against him pursuant to Iowa Court Rule 36.24(1). Unless the Board objects, Said's license will be automatically reinstated on the day after the thirty-day suspension period expires if all costs have been paid. Iowa Ct. R. 34.23(2).

**LICENSE SUSPENDED.**

All justices concur except McDermott, J., who takes no part.